David A. FLOOD, Trustee of Estate of Taylor's Potato Chip Company, Inc. (Bankrupt)

v.

M. P. CLARK, INC. (2 cases).

Civ. A. Nos. 43142, 43464.

United States District Court, E. D. Pennsylvania.

Dec. 7, 1970.

See also D.C., 42 F.R.D. 602.

Ned Stein, Comanor & Stein, Philadelphia, Pa., for plaintiff.

Charles C. Hileman, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for defendant.

## FINDINGS OF FACT, DISCUSSION, CONCLUSIONS OF LAW, AND ORDER

WOOD, District Judge.

### FINDINGS OF FACT

1. Plaintiff, David A. Flood, is the Trustee in Bankruptcy of the Estate of Taylor's Potato Chip Company, Inc., whose address is Bellefonte, Pennsylvania.

2. Defendant, M. P. Clark, Inc., is a corporation located at 226 N. Decatur Street, Strasburg, Pennsylvania. At the time of the transactions involved, defendant was licensed under the Perishable Agricultural Commodities Act, 1930, § 1 et seq., 7 U.S.C. § 499a *et seq.*

3. On or about August 23, 1963, a written contract was entered into between Richard C. Taylor, doing business as Taylor's Potato Chips, and M. P. Clark, Inc., which provided that Clark agreed to sell and Taylor's agreed to buy approximately one trailer load of potatoes every ten days for a period of one year beginning May 1, 1964. The contract further provided that all potatoes would be of chipping quality and delivered at Bellefonte, Pennsylvania, at a price of $3.00 per 100 lbs. The contract also provided that during the months of May, June, July and August, 1964, Taylor's was to be billed at the rate of $4.00

per 100 lbs., and when New York potatoes were delivered thereafter, no invoices were to be submitted until the $1.00 difference in price was made up. Also, all New York potatoes that were delivered out of the ground at time of harvest would cost $2.60 per 100 lbs., but if such potatoes were stored by the seller and delivered later, they would cost $3.00 per 100 lbs. It was agreed that payment would be made by the buyer upon presentation of invoices. It was contemplated by the parties that the potatoes would be shipped in interstate commerce.

4. Sometime between August 23, 1963, and March 16, 1964, Taylor's Potato Chips incorporated and became Taylor's Potato Chip Company, Inc. On or about March 16, 1964, Richard Taylor transferred all of his interest in the assets of Taylor's Potato Chips to the corporation, including the written contract covering the transactions involved herein previously executed by Richard Taylor and M. P. Clark, Inc.

5. Richard Taylor remained as manager of the corporation.

6. Richard Taylor notified by mail all persons with whom he dealt that he had transferred his interest in Taylor's Potato Chips. M. P. Clark did not become aware of said transfer until on or about September 15, 1964, in a conversation with Taylor.

7. A truckload of potatoes consists of approximately 350 100 lb. bags. A delivery of one truckload of potatoes every ten days for one year would constitute a delivery of 12,600 100 lb. bags of potatoes.

8. The first delivery under the contract was made on May 6, 1964 of 175 100 lb. bags of potatoes for which Taylor's Potato Chip Company, Inc., paid $700.00 on or about June 9, 1964. The second delivery under the contract was made on May 12, 1964 of 380 100 lb. bags of potatoes for which Taylor's paid $1,520.00 on or about June 26, 1964.

9. From May 26, 1964, until September 14, 1964, M. P. Clark delivered to Taylor's 2,988 100 lb. bags of potatoes, the total cost of which was $11,802.00. Taylor's paid Clark $10,000.00 on October 14, 1964, and the balance was paid on December 3, 1964.

10. On or about September 15, 1964, M. P. Clark notified Richard Taylor that no further deliveries would be forthcoming until payment for past deliveries was made.

11. On or about October 14, 1964, M. P. Clark agreed to make further deliveries to Taylor's on a c. o. d. basis. A delivery was made on October 20, 1964, of 390 100 lb. bags of potatoes for which Taylor's paid $1,170.00. No further deliveries were made until Taylor's paid the balance due on past deliveries.

12. Clark made deliveries of potatoes to Taylor's on a c. o. d. basis on December 3, 1964, December 16, 1964, December 30, 1964, and January 19, 1965.

13. Clark refused to make any further deliveries to Taylor's after January 19, 1965.

14. After Clark's refusal to make further deliveries, Taylor's purchased 1,433½ 100 lb. bags of potatoes from E. K. Bare & Sons. 375 of the bags were purchased at $5.80 per 100 lbs. The remainder were purchased at $6.00 per 100 lbs.

15. Taylor's made an overpayment of $3,393 on 3,393 100 lb. bags of potatoes purchased from Clark for one dollar over the contract price. This overpayment is still owing to Taylor's.

## DISCUSSION

■ This case arises on appeal by M. P. Clark, Inc., (hereinafter Clark) from a reparation order of the Secretary of Agriculture under the Perishable Agricultural Commodities Act, 1930 § 1 et seq., 7 U.S.C. § 499a et seq. The Secretary found that Clark breached its duty to sell and deliver potatoes to Taylor's Potato Chip Company, Inc., (hereinafter Taylor) pursuant to a contract of sale between the parties.

There are two separate time periods during which deliveries were not made.

The first period is from September 14, 1964, to December 3, 1964.[1] The Secretary concluded that Clark was justified in refusing to make deliveries during that time as Taylor owed $11,800.00 for past deliveries despite the contract provision that payment be made upon presentation of invoices. Taylor's contention is that Clark's refusal to deliver was a breach of the contract as, by its course of performance in accepting prior payments made after the presentation of invoices, Clark waived its right to object to such payments. U.C.C. § 2–208, 12A P.S. § 2–208. However, even were we to conclude that Clark waived the right to demand payment upon presentation of invoices, we cannot conclude that it waived the right to payment within a reasonable time. The evidence is clear that as soon as the president of Clark became aware of the extent of the amount owed by Taylor, he immediately contacted the latter and demanded payment before he would tender further deliveries. We agree with the Secretary that he was within his rights in doing so.

■■ The second time period during which deliveries were not made was from January 19, 1965 until the contract's termination date, April 30, 1965. The testimony is in conflict here as to whether Clark refused to make deliveries or whether Taylor merely refused to request them. The Secretary found that from the weight of the evidence Clark refused to make any deliveries after January 19, 1965, and thereby breached the contract. Such a finding is *prima facie* correct. Wesco Foods Co. v. De Mase, 194 F.2d 918 (3rd Cir. 1952). We find nothing in the evidence before us to overturn this finding. Clark suggests that Taylor purchased potatoes from other suppliers during this time because it could purchase on credit, whereas it could only purchase from Clark on a c. o. d. basis.[2] However, we cannot believe

that Taylor would pay $6.00 per 100 pounds of potatoes instead of the contract price of $3.00 per hundred pounds for the sole purpose of buying on credit.

■ Clark also contends that Taylor's failure to pay for deliveries from June 26, 1964 to October 14, 1964 substantially impaired the value of the entire contract and therefore constituted a breach of the entire contract. U.C.C. § 2–612(3), 12A P.S. § 2–612(3). Consequently, Clark argues, it had the right to cancel the contract with respect to future deliveries. U.C.C. § 2–703, 12A P. S. § 2–703. It is clear, however, that Clark did not cancel the contract at this time, but rather agreed to continue dealing with Taylor provided the dealing was on a c. o. d. basis. There is no evidence as to any act on Taylor's part after the resumption of dealing between the parties which would give rise to the right of cancellation by Clark. Therefore we agree with the Secretary that Clark's failure to deliver potatoes to Taylor from January 19, 1965 to April 30, 1965, constituted a breach of the contract.

■ We next consider the damages for which Clark is liable. It is uncontested that Taylor made an overpayment of $3,393.00 for 3,393 100 pound bags of potatoes delivered during May, June, July and August of 1964. This overpayment was the result of the contract provision that during those months Taylor would pay Clark $4.00 per 100 pounds of potatoes, one dollar per hundred pounds over the contract price, and that on potatoes purchased thereafter, no invoices would be presented until the overpayment was made up. Clark argues that in September, 1964 it offered to provide Taylor with 1,131 bags of potatoes at no cost to make up this overpayment provided Taylor tendered payment for past deliveries by harvest time (October 10, 1964). As Taylor did not tender payment by that date, Clark alleges that it

---

1. Only one delivery was made during this time, a delivery of 390 100 lb. bags on October 20.

2. After Taylor paid Clark the $11,800.00 debt, the parties resumed dealings, but only on a c. o. d. basis.

is thereby relieved from liability. The Secretary found, however, that by attempting to place a limit on the time during which Taylor could receive credit for its overpayment, Clark deviated from the terms of the contract. We agree. We find no justification for Clark's attempt to impose payment by a certain date as a condition for Taylor's receiving credit for an overpayment for which it was clearly entitled to reimbursement.

The remaining question is the amount of damages for which Clark is liable because of its failure to deliver potatoes to Taylor after January 19, 1965. The Secretary determined damages by first computing the amount of potatoes which should have been delivered under the contract provision "one trailer load of potatoes every ten days." He established that this amounted to ten deliveries of 350 100 pound bags of potatoes or a total of 3,500 100 pound bags. He then awarded as damages the difference between the market price and the contract price of this quantity of potatoes. Under the contract price of $3.00 per 100 pounds, the potatoes would have cost $10,500.00. Under the market price of $6.00 per hundred pounds, the potatoes would cost $21,000.00. Therefore his award of damages was $10,500.00.[3]

■ The Secretary did not, however, take into account the fact that during this period Taylor purchased substitute goods elsewhere. Where a party effects cover the amount of damages is the difference between the cost of its cover and the contract price. U.C.C. § 2–712(2), 12A P.S. § 2–712(2).[4] Taylor, in a commercially reasonable manner purchased 1,433½ 100 pound bags of potatoes from another supplier at a cost of $8,526.00. The contract price of these potatoes would have been $4,300.50. Therefore the measure of damages is the difference between the two figures or $4,225.-50.

■ We observe, however, that while the Secretary found that under the contract Taylor was entitled to 3,500 bags of potatoes from January 19, 1965 to April 30, 1965, Taylor effected cover only as to 1,433½ bags. It remains to be determined, therefore, whether Taylor should also be allowed to recover as damages the difference between the market price and contract price as to those, 2,066½ bags of potatoes for which he did not effect cover. We conclude that he should not.

The Secretary gave a literal construction to the provision of the contract that Clark would deliver "*approximately* one trailer load of potatoes every ten days for a period of one year." He interpreted this as imposing upon Clark the duty of delivering to Taylor 36 trailer loads of 350 100 pound bags of potatoes. On page two of the contract, however, the purchaser is given the right to take possession of the goods if "the Seller shall fail to deliver the potatoes required in the quantities, condition and at times specified by Purchaser. * * *" This provision would indicate that Taylor was to specify the times and quantities of delivery rather than have Clark make a uniform delivery every ten days. The contract also contains the provision "[D]ays of shipment to be according to mutual agreement * * * in order to handle potatoes in a good husbandlike manner." This provision also indicates to us that the provision for delivery "approximately every ten days" was not intended as setting forth the precise terms of delivery, but was rather the estimate of the parties as to what Taylor's requirements would be.

The course of performance between the parties further supports this interpretation. Both parties testified that

3. This award was in addition to the $3,-393.00 award for the overpayment made by Taylor. The Secretary's total award was $13,893.00 plus interest of 6% per annum from May 1, 1965.

4. A party may also under this section recover any incidental or consequential damages as defined in U.C.C. § 2–712, 12A P.S. § 2–712. Neither are alleged here.

representatives from Taylor would telephone Clark whenever they required a shipment. On two occasions twenty days elapsed between deliveries. In addition, we note that the first delivery under the contract was made on May 6, 1964. Had the parties paid strict adherence to the ten-day provision, total deliveries by September 13, 1964 would have amounted to 4,725 100 pound bags of potatoes. In fact, by that date only 3,543 bags had been delivered, and yet the evidence is clear that at that time neither party considered the contract as being in breach. For these reasons we conclude that the controlling provision regarding shipment was that deliveries would be made by mutual agreement, and the practical effect of this provision was that Taylor would request deliveries from Clark which would then be made.

Consequently, during the period from January 19, 1965 to April 30, 1965, Clark's obligations were, as they had been from the outset of the contract, to deliver potatoes upon Taylor's request. As Taylor could make no requests because of Clark's prior refusal to continue deliveries, the relevant figure in determining what quantity would most likely have been requested is the quantity of substitute potatoes purchased by Taylor, or 1,433½ bags, and not 3,500 bags.

Finally, the Perishable Agricultural Commodities Act provides that on appeal from a reparation order of the Secretary, the appellee shall, if he prevails, be allowed a reasonable attorney's fee to be taxed and collected as part of his costs. Counsel for Taylor has suggested a sum of $1,500.00 which we believe is a reasonable figure.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and the subject matter.

2. M. P. Clark, Inc. entered into a valid, binding contract with Richard C. Taylor. A valid assignment of this contract was made by Richard C. Taylor to Taylor's Potato Chip Company, Inc., U. C.C. § 2–210, 12A P.S. § 2–210.

3. M. P. Clark, Inc. did not breach the contract by refusing to deliver potatoes to Taylor's Potato Chip Company, Inc., from September 14, 1964 to December 3, 1964.

4. The refusal of M. P. Clark, Inc. to deliver potatoes to Taylor's Potato Chip Company, Inc., from January 19, 1965 to April 30, 1965 was a breach of the contract.

5. M. P. Clark, Inc. is liable to David A. Flood, Trustee of Estate of Taylor's Potato Chip Company, Inc. (Bankrupt) in the sum of $7,618.50 with interest at six per cent per annum from May 1, 1965.

6. Plaintiff's counsel is entitled to a reasonable attorney's fee of $1,500.00 under the Perishable Agricultural Commodities Act, § 499g(c).