David E. DANGERFIELD, d/b/a
Dangerfield Potato Company,
Plaintiff and Appellant,

v.

Dean MARKEL, Defendant and Appellee.

Civ. No. 9277.

Supreme Court of North Dakota.

March 24, 1977.

Rehearing Denied April 25, 1977.

Shaft, McConn & Fisher, Grand Forks, for plaintiff and appellant; argued by Patrick W. Fisher, Grand Forks.

DePuy & O'Connor, Grafton, for defendant and appellee; argued by W. R. Goulet, Jr., Grafton.

PEDERSON, Justice.

Dangerfield, a potato broker, appeals from a judgment of the district court of Walsh County which dismissed his amended complaint and awarded Markel, a potato grower, damages on a counterclaim for payments withheld, plus damages for breach of contract. We reverse and remand.

The complaint alleged that Markel had breached a contract to sell Dangerfield 25,-000 cwt. of potatoes during the 1972–1973 shipping season. It also alleged that Markel refused to deliver 15,078 cwt. of potatoes during the contract period, forcing Dangerfield to purchase potatoes on the open market to fulfill a contract with potato processors. As a result of this alleged breach, Dangerfield claims to have suffered severe financial hardship, shortage of capital, damaged business reputation, loss of business and lessened business growth. He prayed for general damages of $56,310, and consequential damages of $101,745, less a setoff of $3,840.68 withheld by Dangerfield from payments due Markel for potatoes delivered.

Markel counterclaimed for the above mentioned $3,840.68 withheld by Dangerfield and, in addition, for damages allegedly suffered as a result of Dangerfield's breach of contract. In awarding Markel the $3,840.68 withheld by Dangerfield, the lower court dismissed the remainder of Markel's counterclaim. That dismissal is not at issue on this appeal. Procedural matters and the application of the Statute of Frauds in this case were considered on a previous appeal to this Court, *Dangerfield v. Markel*, 222 N.W.2d 373 (N.D.1974).

The dispute concerns a contract entered into by the parties on June 13, 1972. The parties initially experienced difficulties in the fall of 1972, Dangerfield making frequent requests upon Markel for delivery of potatoes, and Markel complaining of Dangerfield's failure to pay promptly for potatoes delivered.

On December 1, 1972, Markel, through his attorney, notified Dangerfield by letter that he considered the contract breached because of Dangerfield's continued failure to make prompt payment. The parties met on December 5, and apparently agreed to fulfill their obligations under the contract. Both parties testified at trial that they agreed at this meeting to continue performing the contract, but they disagree about the substance of an oral modification of the payment provisions of the contract. Markel contends that Dangerfield agreed to pay for each shipment of potatoes within fifteen days of delivery. Dangerfield denies this, and contends that he agreed only to promptly pay for potato shipments. In a letter to Markel's attorney dated December 6, 1972, Dangerfield stated:

"I can understand that Dean is looking for prompt pay, which I assured him would be forthcoming on future loads. I sincerely hope that all misunderstandings are now eliminated and that our persomal friendship shall be able to continue as previous to this situation."

There were no findings of fact nor conclusions of law prepared, which is permissible under Rule 52(a), NDRCivP; however, the trial court found in its memorandum

opinion that at the December 5 meeting the parties orally agreed that thereafter payment was to be made by Dangerfield within fifteen days of delivery. The evidence indicates that, even after the December 5 meeting, Dangerfield did not pay for shipments within fifteen days on at least one occasion. In spite of this late payment, Markel continued to make deliveries under the contract. On the date that Markel finally gave notice of his suspension of deliveries (February 10, 1973), Dangerfield had become current with his payments and, although he had not paid for all potatoes delivered, the fifteen-day period had not expired since those deliveries. On February 13, 1973, Dangerfield informed Markel by letter that he considered the contract breached by Markel and indicated that he (Dangerfield) would pursue available remedies under the Uniform Commercial Code.

In his brief Dangerfield argues that the trial court committed several errors in law, made several clearly erroneous findings of fact, and failed to find certain facts which were established by the evidence. Dangerfield challenges several findings of the trial court which relate only to the first alleged contract breach by Dangerfield on December 1, 1972, including determinations by the court that: (1) time was of the essence in the original contract of June 13, 1972; (2) oral evidence established a thirty-day payment provision in that contract; and (3) evidence indicated that Dangerfield was insolvent on or before December 1, 1972.

The trial court, however, in the remainder of its memorandum opinion and in the memorandum opinion filed with its order denying the plaintiff's motion for a new trial, indicated that the decision is based upon a finding that Dangerfield breached the contract as orally modified on December 5, 1972 (which established a fifteen-day payment provision), and not upon the conduct of the parties which related only to the terms of the original contract (providing for thirty-day payments).

 The letter acknowledging the December 5 meeting sent by Dangerfield to Markel on December 6 clearly indicated a mutual agreement to continue performance of the contract. Performance by both parties subsequent to December 5 constitutes a waiver of any right to cancel the contract for any prior nonperformance. 17A C.J.S. Contracts §§ 443, 491, 492(1); § 41–02–75(3) (2–612), NDCC. Even if the oral modification fails to satisfy the Statute of Frauds (§ 41–02–08 (2–201), NDCC) because of the provisions of § 41–02–16(3) (2–209), NDCC, it can operate as a waiver (§ 41–02–16(4) (2–209), NDCC).

We will consider only those issues raised by Dangerfield relating to the facts and circumstances surrounding the December 5 meeting between the parties, and the conduct of the parties subsequent to that date.

In substance, Dangerfield contends on appeal that: (1) the trial court erred in receiving parol evidence to establish that at the December 5, 1972, meeting Dangerfield agreed to pay for future shipments of potatoes within fifteen days of delivery; and (2) the court erred in failing to find that Markel had waived his right to strict compliance with the fifteen-day payment provision by continuing to make deliveries after that provision had been breached.

## PAROL EVIDENCE TO ESTABLISH FIFTEEN–DAY PAYMENT PROVISION

In its memorandum opinion the trial court stated:

"The meeting of December 5, however, served to resolve at least partially the differences between the parties. At this meeting the plaintiff agreed to pay for potatoes within fifteen days of delivery. Acting on this parol agreement, the defendant under the reinstated contract shipped six loads of potatoes to the plaintiff commencing with a shipment on January 9 and ending with two shipments on February 10. Such shipments by the defendant were in execution of the oral agreement of December 5 and served to alter and modify the original agreement of the parties so that the plaintiff was obligated to make payments for potatoes

within fifteen days of delivery which he failed to do. Not having received payment within the stipulated fifteen day period the defendant was justified in cancelling the contract which he effectively did by oral notification thereof, an affirmative action on his part, written notice therefor not being a code requirement."

While not explicitly stated, the trial court appears to have found an enforceable oral modification of the contract based upon §§ 41–02–15 (2–208) and 41–02–16 (2–209), NDCC, which provide:

"41–02–15. (2–208) *Course of performance or practical construction.*—1. Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.

2. The express terms of the agreement and any such course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms shall control course of performance and course of performance shall control both course of dealing and usage of trade (section 41–01–15).

3. Subject to the provisions of the next section on modification and waiver, such course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance."

"41–02–16. (2–209) *Modification, rescission and waiver.*—1. An agreement modifying a contract within this chapter needs no consideration to be binding.

2. A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded, but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party.

3. The requirements of the statute of frauds section of this chapter (section 41–02–08) must be satisfied if the contract as modified is within its provisions.

4. Although an attempt at modification or rescission does not satisfy the requirements of subsection 2 or 3 it can operate as a waiver.

5. A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver."

In considering the oral modification provisions of the Uniform Commercial Code in *Farmers Elevator Co. of Reserve v. Anderson,* 552 P.2d 63, 65–66 (Mont.1976), the Supreme Court of Montana stated:

"Section 87A–2–209(4) provides that an attempt at modification which is void under the statute of frauds may still operate as a waiver to assert the defense through the course of performance engaged in by the parties under section 87A–2–208, R.C.M.1947. 2 Williston on Sales (4th Ed.), § 12–6, p. 23. While the trial court did not make a specific finding holding there was a waiver, its findings when read as a whole, do find there was a waiver and consent by Anderson. Under section 87A–1–103, the Uniform Commercial Code can be supplemented, for purposes of interpretation, by the general principles of law and equity, unless specifically displaced by the Code. The facts presented in the instant case, require that we find that a waiver such as is contemplated by section 87A–2–209(4) occurred and we agree.

\* \* \* \* \* \*

"By delivering, pursuant to contract, approximately 36 truckloads of wheat to the elevator between March 27 and May 30, 1973, Anderson established a course of conduct sufficient to constitute a waiver

of his right to assert a defense under the statute of frauds."[1]

In addition to our recognition of Uniform Commercial Code interpretations from other states as urged by § 41–01–02(2)(c) (1–102), NDCC, we think there is another basis here for determining that the oral modification is enforceable. Section 41–02–16(3) (2–209), NDCC, provides that the requirements of the Statute of Frauds must be satisfied if the contract, as modified, is within its provisions. Since this oral modification does come within the Statute of Frauds it must fall within one of the enumerated exceptions to Section 41–02–08 (2–201), NDCC, to be enforceable.

"41–02–08. (2–201) *Formal requirements—Statute of frauds.*—1. Except as otherwise provided in this section a contract for the sale of goods for the price of five hundred dollars or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

2. Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection 1 against such party unless written notice of objection to its contents is given within ten days after it is received.

3. A contract which does not satisfy the requirements of subsection 1 but which is valid in other respects is enforceable

a. if the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement; or

b. if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted; or

c. with respect to goods for which payment has been made and accepted or which have been received and accepted (section 41–02–69)."

At trial both Dangerfield and Markel testified that they had orally agreed at the December 5 meeting to continue fulfilling the contract. The only dispute is to the payment provision, and Dangerfield denies that he agreed to pay within fifteen days of delivery. We think that Dangerfield's testimony in court that a contract was made renders the contract enforceable under Section 41–02–08(3)(b) (2–201), NDCC.

The official comment to that section states:

"If the making of a contract is admitted in court, either in a written pleading, by stipulation or by oral statement before the court, no additional writing is necessary for protection against fraud. Under this section it is no longer possible to admit the contract in court and still treat the Statute as a defense. However, the contract is not thus conclusively established. The admission so made by a party is itself evidential against him of the truth of the facts so admitted and of

---

1. For an interesting discussion of whether the term "waiver" in Section 41–02–16(4) [2–209(4)] refers to a waiver of the Statute of Frauds or a waiver of a particular condition, term, or portion of the written contract sought

to be waived by a party entitled to waive it, see *Double-E Sportswear Corp. v. Girard Trust Bank*, 488 F.2d 292 (3rd Cir. 1973), and the concurring opinion of Garth, Circuit Judge.

nothing more; as against the other party, it is not evidential at all." (Official comment prepared by National Conference of Commissioners on Uniform State Laws and The American Law Institute.)

The effect of an admission that a contract was made is to deprive the one making the admission of any subsequent reliance on the Statute of Frauds as a defense.

"The theoretical justification for the Code rule, which explicitly extends to testimony as well as pleading, is that a voluntary admission of the existence of a contract should result in loss of the statute as a defense. The statute should not be used to perpetrate frauds, and if under oath the existence of a contract is admitted, the use of the statute should thereupon be denied. The effect of the rule is that it allows the party asserting the contract to present his oral evidence in proof of its existence." 3 Bender's Uniform Commercial Code Service, Duesenberg & King, Sales and Bulk Transfers, § 2.04[3], pp. 2–80, 2–81.

In considering the effect of a judicial admission of the existence of a contract upon a term of a contract which was not specifically denied by the plaintiff against whom the term was asserted as a defense, *Giant Peanut Company v. Carolina Chemicals, Inc.,* 129 Ga.App. 718, 200 S.E.2d 918, 920 (1973), states that:

"The contract of sale is asserted by the plaintiff in the action brought and admits that a contract exists; the testimony of the defendant president shows that a contract for sale exists. * * * The defense of the defendant here is based upon one of the terms of the contract of sale, and even if in parol, such term of the contract of sale may be proven once the contract itself is admitted."

In construing the Statute of Frauds provision of Article 8 which is found in Section 8–319 (§ 41–08–35, NDCC), dealing with contracts for the sale of securities (a Statute of Frauds section almost identical to the Article 2 Statute of Frauds provision), the court, in *Kohlmeyer & Company v. Bowen,* 126 Ga.App. 700, 192 S.E.2d 400, 405 (1972), stated:

"Although Bowen further claimed that he was entitled to interest from March 20 rather than from the 'due date,' there is no requirement that defendant admit the entire terms of the contract as contended for by the plaintiff but only that he admit a contract of sale of a stated quantity of described securities at a defined or stated price. This is sufficient to take the parol contract out of the statute so that it can be proven and enforced as proven."

■ The court noted that when a contractual term is disputed by the parties, it raises a fact issue for the court, which should be decided in a manner consistent with the other terms of the contract admitted by the parties. See, e. g., *Cargill, Inc., Commodity Marketing Div. v. Hale,* 537 S.W.2d 667 (Mo.App.1976); *Lewis v. Hughes,* 276 Md. 247, 346 A.2d 231 (1975); *Garrison v. Piatt,* 113 Ga.App. 94, 147 S.E.2d 374 (1966).

A major purpose of the Uniform Commercial Code's Statute of Frauds provision is to ensure the valid existence of a contract. Comment 1 to § 41–02–08 (2–201) states:

"All that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction."

Once the existence of the contract is established by such solemn evidence as testimony admitted under oath in court, the policy behind the statute is fulfilled, the oral modification of the contract becomes binding under § 41–02–16 (2–209), and the only remaining task is to ascertain the precise terms of the modification by properly admissible evidence. The only limitation placed upon the use of other evidence under § 41–02–08(3)(b) (2–201) is that the contract is not enforceable beyond the quantity of goods admitted.

■ The trial court, after considering the evidence, concluded that the parties had agreed to a fifteen-day payment provision

in their oral modification of the contract on December 5, 1972. Although Dangerfield denied such an agreement, the court apparently was persuaded by Markel's testimony, by the circumstances surrounding the December 5 meeting, and by the letter sent to Markel by Dangerfield on December 6, 1972, in which Dangerfield gave assurances that prompt payment would be forthcoming. While we do not accept Dangerfield's argument that that letter represents a confirmatory memorandum intended by the parties as a final expression of their agreement within the purview of § 41–02–09 (2–202), we do think the letter indicates Dangerfield's acceptance of a term modifying the original payment period, evidence consistent with Markel's testimony and sufficient for the trial court to conclude that the parties orally agreed to reduce the period between delivery and payment to fifteen days, a finding of fact which we cannot say is clearly erroneous. Rule 52(a), NDRCivP.

## WAIVER OF THE FIFTEEN–DAY PAYMENT PROVISION

Dangerfield argues in the alternative that even if the evidence establishes that the parties orally modified the contract on December 5, 1972, to include a fifteen-day payment provision, the subsequent delivery of potatoes by Markel at and after the time when Dangerfield had breached that condition by failing to pay within the prescribed time constituted a waiver of his right to claim breach of contract. Dangerfield failed to pay for a January 9 shipment of potatoes until February 5, well beyond the fifteen-day prescribed payment period, but, in spite of this, Markel continued to deliver potatoes until February 10, at which time he notified Dangerfield of his intention to discontinue shipments. It is significant that on February 10 Dangerfield had become current in his payments, and the fifteen-day period had not expired on any of the shipments of potatoes made after January 9.

██ We have defined "waiver" as the voluntary and intentional relinquishment and abandonment of a known existing right, advantage, benefit, claim, or privilege, which, except for such waiver, the party would have enjoyed. *Stenehjem v. Sette*, 240 N.W.2d 596 (N.D.1976). A party who makes an unexplained delay in enforcing his contractual rights or who accepts performance in a manner different from that required by the contract has been held to have acquiesced to the nonconforming performance made by the other party. 2 Williston on Sales, Squillante & Fonseca, § 12–8, p. 39 (4th ed. 1973).

In *Western Transmission Corp. v. Colorado Mainline, Inc.*, 376 F.2d 470, 472 (10th Cir. 1967), the court said:

"It is elementary that an innocent party may waive a breach of a contract and continue performance on his part. If such performance is continued with no conditions attached, the innocent party has made an election and waived the breach."

Dangerfield bases his waiver argument upon a case remarkably similar to the instant case, *Flood v. M. P. Clark, Inc.*, 319 F.Supp. 1043, 1046 (E.D.Pa.1970). In that case Clark had contracted to deliver potatoes to Taylor, payment to be made on presentation of invoices. Taylor fell behind in payments, and Clark refused to make further deliveries. The parties later agreed to continue under the contract on a c. o. d. basis. Taylor became current in his payments, but Clark again discontinued his deliveries. Commenting on Clark's second refusal to deliver potatoes, the court said:

"Clark also contends that Taylor's failure to pay for deliveries from June 26, 1964 to October 14, 1964 substantially impaired the value of the entire contract and therefore constituted a breach of the entire contract. U.C.C. § 2–612(3), 12A P.S. § 2–612(3). Consequently, Clark argues, it had the right to cancel the contract with respect to future deliveries. U.C.C. § 2–703, 12A P.S. § 2–703. It is clear, however, that Clark did not cancel the contract at this time, but rather agreed to continue dealing with Taylor provided the dealing was on a c. o. d. basis. There is no evidence as to any act

on Taylor's part after the resumption of dealing between the parties which would give rise to the right of cancellation by Clark. Therefore we agree with the Secretary that Clark's failure to deliver potatoes to Taylor from January 19, 1965 to April 30th, 1965, constituted a breach of the contract."

The trial court, in its memorandum opinion denying Dangerfield a new trial, stated:

"In failing to make payment for loads delivered in January 1973, the plaintiff breached the modified contract entitling the defendant to cancel it. This differentiates the instant case from *Flood v. Clark,* 319 F.Supp. 1043 (1970), cited by the plaintiff in support of his motion for new trial."

The record indicates that the first delivery of potatoes after the December 5 oral modification was shipped on January 9, 1973. That delivery was paid for on February 5, 1973, beyond the fifteen-day payment period but five days before Markel refused further deliveries. During that five-day period between Dangerfield's late payment and Markel's subsequent refusal to deliver, Markel delivered four more shipments of potatoes, two on February 8 and two on February 10. When Markel refused to deliver future shipments, only potato shipments of January 30, February 8, and February 10 remained unpaid. The fifteen-day payment period had not expired on any of these shipments, and Markel appears to be without a basis for his cancellation of the contract at that time.

The trial court did not specifically refer to the Code section which deals with installment contracts. Section 41–02–75 (2–612), NDCC, which appears to be relevant, provides:

"1. An 'Installment contract' is one which requires or authorizes the delivery of goods in separate lots to be separately accepted, even though the contract contains a clause 'each delivery is a separate contract' or its equivalent.

"2. The buyer may reject any installment which is nonconforming if the nonconformity substantially impairs the value of that installment and cannot be cured or if the nonconformity is a defect in the required documents; but if the nonconformity does not fall within subsection 3 and the seller gives adequate assurance of its cure the buyer must accept that installment.

"3. Whenever nonconformity or default with respect to one or more installments substantially impairs the value of the whole contract there is a breach of the whole. But the aggrieved party reinstates the contract if he accepts a nonconforming installment without seasonably notifying of cancellation or if he brings an action with respect only to past installments or demands performance as to future installments."[2]

There is little evidence in the record to indicate that delay in payment of one potato shipment substantially impaired the value of the whole contract. Evidence indicated nothing unusual about slow payments in the potato industry. *Gulf Chemical & Metal. Corp. v. Sylvan Chem. Corp.,* 122 N.J.Super. 499, 300 A.2d 878 (1973). We note that subsection 3 above provides for reinstatement of the contract by the aggrieved party in the absence of seasonable notification of cancellation.

The danger of wrongfully alleging breach was noted by the court in *Walker & Company v. Harrison,* 347 Mich. 630, 81 N.W.2d 352, 355 (1957):

"But the injured party's determination that there has been a material breach, justifying his own repudiation, is fraught with peril, for should such determination,

2. The official comment to this section states: "Whether the non-conformity in any given installment justifies cancellation as to the future depends, not on whether such non-conformity indicates an intent or likelihood that the future deliveries will also be defective, but whether the non-conformity substantially impairs the value of the whole contract. If only the seller's security in regard to future installments is impaired, he has the right to demand adequate assurances of proper future performance but has not an immediate right to cancel the entire contract."

as viewed by a later court in the calm of its contemplation, be unwarranted, the repudiator himself will have been guilty of material breach and himself have become the aggressor, not an innocent victim."

◼ It is significant that, according to evidence of Markel's stocks on hand introduced by Dangerfield in the form of an exhibit at trial, as of February 10 when Markel refused further deliveries, it appears that Markel had considerably fewer potatoes on hand than he owed Dangerfield on the contract. We believe that, under the law and the evidence in this case, Markel's right to cancel the contract because of Dangerfield's breach of the fifteen-day payment provision (even if found to substantially impair the value of the whole contract) was waived by Markel when he continued to make deliveries under the contract, or, more correctly, Markel's subsequent shipment of potatoes indicates an election on his part to continue performance of the contract. 3A Corbin on Contracts, §§ 754, 755; *Daniel v. Hamilton,* 61 N.W.2d 281 (N.D.1953). To avoid a possible misunderstanding, we add that the waiver by Markel was not a waiver of future prompt payments by Dangerfield, but only a waiver of Markel's right to cancel the contract on the basis of previous breaches by Dangerfield.

◼ Markel's subsequent refusal to make any further deliveries (at a time when Dangerfield had become current with his payments and was therefore in compliance with the payment provisions of the contract) constituted a breach by Markel of the oral agreement, giving rise to damages under the Uniform Commercial Code. It was error for the trial court to find that Markel could cancel because of a default by Dangerfield which Markel had previously waived. Findings are clearly erroneous when they are without substantial evidentiary support or are induced by an erroneous view of the law. See, Rule 52(a), NDRCivP, and *Stee v. "L" Monte Industries, Inc.,* 247 N.W.2d 641, 644 (N.D.1976).

The judgment is reversed and the case is remanded for such further proceedings by the trial court as are consistent herewith.

ERICKSTAD, C. J., and VOGEL, PAULSON and SAND, JJ., concur.