STINNES INTEROIL, INC., Plaintiff,

v.

APEX OIL CO., Goldstein Oil Co. and Novelly Oil Co., Defendants.

No. 84 Civ. 6622(PKL).

United States District Court,
S.D. New York.

March 8, 1985.

Cahill, Gordon & Reindel, New York City (Thomas R. Jones, Paula A. Franzese, New York City, of counsel), for plaintiff.

Cadwalader, Wickersham & Taft, New York City (Pamela R. Chepiga, Edward P. O'Keefe, New York City, of counsel), for defendants.

## MEMORANDUM AND ORDER

LEISURE, District Judge:

In this suit for breach of contract[1] defendants Apex Oil Co., Goldstein Oil Co. and Novelly Oil Co. (collectively "Apex") have moved pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss the complaint for failure to state a claim upon which relief may be granted, or in the alternative, to transfer this action to the Eastern District of Missouri under 28 U.S.C. § 1404(a)[2]. I con-

clude that neither prong of defendants' motion should be granted.

## I. SUFFICIENCY OF THE COMPLAINT—RULE 12(b)(6).

It is elementary that for purposes of a motion under Rule 12(b)(6), the allegations of the complaint are taken "at face value." *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 515, 92 S.Ct. 609, 614, 30 L.Ed.2d 642 (1972); *Merchants Bank of N.Y. v. Credit Suisse Bank,* 585 F.Supp. 304, 311 (S.D.N.Y.1984). The function of a motion to dismiss "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). The complaint may be dismissed only if it appears to a certainty that plaintiff could prove no set of facts entitling him to relief. *See McLain v. Real Estate Board,* 444 U.S. 232, 246, 100 S.Ct. 502, 511, 62 L.Ed.2d 441 (1980); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). In evaluating the sufficiency of the allegations, the court must bear in mind Rule 8(a)'s instruction that the complaint be a "short and plain statement of the claim." *See* 5 C.A. Wright & A.R. Miller, Federal Practice and Procedure: Civil §§ 1356 at 590, 1357 at 598 (1969).

### A. *Facts.*

Stinnes and Apex both engage in the business of petroleum trading. On January 25, 1982, Stinnes and Apex entered into an agreement for Apex to purchase blended gasoline from Stinnes. The written contract provided for February delivery of

---

**1.** Federal jurisdiction herein is premised on the parties' diversity of citizenship, under 28 U.S.C. § 1332 (1982). Plaintiff Stinnes Interoil, Inc. is a Delaware corporation with its principal place of business in New Jersey. Defendants Goldstein Oil Co. and Novelly Oil Co. are incorporated and have their principal places of business in Missouri. They are general partners of Apex Oil Co., which is a Missouri partnership. Apex's

principal place of business is in Missouri, though it has a small office in New York.

**2.** Section 1404(a) reads as follows:
(a) For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

500,000 barrels at 91¼¢ per gallon.[3] The parties agreed that Missouri law would control. The contract did not expressly indicate that time was of the essence.

By February 22, 1982, Stinnes had delivered about 360,000 barrels to Apex in a number of separate deliveries, all of which were accepted. Each delivery was separately invoiced and paid for. With delivery of 140,000 barrels still outstanding, Stinnes, at Apex's request, agreed to a "book transfer" of about 150,000 barrels. A book transfer is an accepted industry method of settling obligations between oil traders. In essence, it transfers ownership of petroleum by means of book entries. In this case, Stinnes book-transferred some 150,000 barrels owed to it by Irving Petroleum Co. to United Oil Co. at Apex's request. According to the complaint, Apex was told that if Stinnes were to comply with Apex's request to book-transfer 150,-000 barrels to United, then Stinnes could fulfill its obligation to deliver the 140,000 barrels due Apex under the January 25 agreement only when a certain tanker arrived in port. Since the tanker was due to arrive on February 27 or 28, any delay in arrival would result in a late delivery. Stinnes claims that Apex knew of and accepted this possibility, and decided to proceed with the book transfer anyway.

As matters turned out, the ship was delayed at sea because of adverse weather conditions. It did not arrive until March 2. Stinnes repeatedly attempted to notify Apex once it became clear that the ship would be delayed. On March 1, Apex informed Stinnes that it would refuse delivery as untimely. Nevertheless, on March 2 Stinnes tendered the gasoline to Apex, which repeated its refusal to accept. Stinnes then disposed of the gasoline in what was then a falling market, incurring thereby losses of over $716,000. This suit followed in September 1984.

**B.** *Discussion.*

The Rule 12(b)(6) prong of Apex's motion is premised on the theory that the complaint alleges no more than a breach of the contract by Stinnes and thus is deficient on its face. Its argument runs essentially as follows. Apex was entitled to a perfect tender under § 2–601 of the Uniform Commercial Code ("UCC"), V.M.A.S. § 400.2–601, so it was justified in rejecting late delivery. The January 25, 1982 contract was not and could not have been modified by the subsequent book transfer because, first, each contract was independent, and second, the January 25 agreement by its terms precluded parol modification. Finally, Apex argues that the force majeure clause of the contract has no application in this instance.

■ 1. *Perfect tender.* Relying on § 2–601, Apex argues that Stinnes breached the January 25 contract by delivering the outstanding barrels of gasoline on March 2 rather than during February. Often referred to as the "perfect tender rule," § 2–601 permits a buyer to reject an entire shipment of goods for "fail[ure] in any respect to conform to the contract...." Apex's argument is simple. The contract called for February delivery. The complaint itself says that goods were delivered not in February, but in March. Apex had the right to insist on literal, punctilious performance under § 2–601. Therefore, its rejection of Stinnes's tender of delivery was entirely proper. The bottom line is that the complaint itself states that it was Stinnes and not Apex which breached the agreement; therefore the Rule 12(b)(6) motion should be granted.

Stinnes, on the other hand, argues that the January 25 contract was actually an installment contract, which is exempt from the perfect tender rule of § 2–601. Stinnes points to the fact that the gasoline had been delivered during February in several lots, each separately invoiced and paid for, as evidence that this was in fact an install-

---

**3.** The complaint alleges that delivery was to be at New York Harbor (¶ 7). Defendants' papers pinpoint the place of delivery at Carteret, N.J.

ment contract. Installment contracts are governed by § 2–612, which, unlike § 2–601, permits the buyer to reject a delivered installment only "if the non-conformity substantially impairs the value of that installment." It is Stinnes's contention that a two-day delay in delivery does not constitute a "substantial impairment."

■ Whether the delay substantially impaired the value of the last 140,000 barrels of gasoline is a question of fact.[4] *See Cherwell-Ralli, Inc. v. Rytman Grain Co.,* 180 Conn. 714, 433 A.2d 984, 986 (1980); *Graulich Caterer Inc. v. Hans Holterbosch, Inc.,* 101 N.J.Super. 61, 243 A.2d 253, 262 (N.J.App.1968). So if this was in fact an installment contract, Apex's motion would be immediately denied. It is, however, at least open to question whether the instant agreement may be read as an installment contract.

■ Section 2–612(1) defines an installment contract as "one which requires or authorizes the delivery of goods in separate lots to be separately accepted...." Comment 1 to that section explains that "in-

stallment contract" is defined broadly "so as to cover installment deliveries tacitly authorized by the circumstances." Thus, Stinnes contends that the contract contemplated or authorized installment deliveries, and hence is an installment contract within § 2–612(1). On the other hand, § 2–307 provides that even in non-installment contracts, delivery may be in lots if the circumstances warrant it, and payment in such cases may be demanded lot by lot. So the import of the earlier delivery of 360,000 barrels in separate lots which were separately invoiced and paid for is not at all clear. The delivery of lots could signify an installment contract equally as well as it could signify a unitary contract with delivery in lots.[5] Which characterization is correct is a question of fact. Since the complaint alleges that delivery of the first 360,-000 barrels was "pursuant to the terms of the Agreement" (¶ 10), it may fairly be read to allege that the contract authorized delivery in separate lots separately accepted. It should therefore be open to Stinnes to prove that such was the case.[6]

---

**4.** Stinnes supports its argument of no substantial impairment by pointing to the absence in the contract of any indication that time was of the essence. Apex, on the other hand, asserts that because there was a falling market at the end of February, any delay necessarily impaired the value of the gasoline to a trader. This dispute demonstrates that there is indeed a set of facts which, assuming an installment contract, could be proved in support of Stinnes's claim.

Apex correctly points out that failure to comply with a delivery deadline can constitute substantial impairment. *See* UCC § 2–612, comment 4 ("Substantial impairment of the value of an installment can turn not only on the quality of the goods but also on such factors as time...."). That does not mean, however, that any delay necessarily impairs the value of an installment in all circumstances. *See, e.g. Dangerfield v. Markel,* 252 N.W.2d 184, 192 (N.D. 1977) (one day delay in payment of potato shipment found not to be a substantial impairment).

**5.** Apex relies on *Neal-Cooper Grain Co. v. Texas Gulf Sulphur Co.,* 508 F.2d 283, 292 (7th Cir. 1974) to prove that where a contract calls for delivery of a quantity of goods during a specified period of time, it is a unitary contract contemplating delivery in lots rather than an installment contract. That case does not, however, hold that such a contract *as a matter of*

*law* is a unitary contract. In *Neal-Cooper,* the defendant simply had offered no proof that more was involved than the surface meaning of the contract implied. In the posture of the instant case, however, Stinnes should not be precluded from introducing proof that the parties did indeed intend to create an installment contract, regardless of how a third party like the Court might otherwise read the words of the agreement. *See infra* note 6.

**6.** The fact that the written January 25 agreement included a merger clause which purports to exclude all "promises, agreements or warranties" beyond the four corners of the writing does not stand in the way of Stinnes proving its case. Sections 1–205(4) and 2–208(2) direct that whenever possible, the language of the contract should be harmonized with usages of trade, the parties' prior course of dealing, and the prior course of performance of the contract in question. *See Federal Express Corp. v. Pan Am. World Airways, Inc.,* 623 F.2d 1297, 1300–01 (8th Cir.1980). Furthermore, these three factors may be used to explain or supplement even a written agreement which, like this one, is intended as a "final expression" of the contract as to the terms contained in the writing. UCC § 2–202. Thus, it is conceivable that Stinnes could prove that the intent of the parties was to create an installment contract.

■ 2. *Modification—the February 22 book transfer.* Stinnes argues that the January 25 contract was modified when Stinnes agreed to participate in the February 22 book transfer of 150,000 barrels of gasoline. It reasons as follows. The 150,-000 barrels Stinnes used in the book transfer could have been used to satisfy its obligations to Apex under the January 25 contract. When Apex asked it to use that gasoline in the book transfer, Stinnes told Apex that it would do so, but that doing so would mean Stinnes could deliver the 140,-000 barrels outstanding under the January 25 contract only upon the arrival of a certain tanker, which was due on February 27–28 and could be delayed. Apex nevertheless desired to consummate the book transfer. By doing so, therefore, Apex agreed to a short delay in delivery of the 140,000 barrels due it under the January 25 agreement.

Apex raises as a bar to this argument the final clause of the agreement, which provides that it can not be amended except by "express written agreement of both parties." Under § 2–209(2), such clauses are binding. Moreover, § 2–209(3) requires that a modified contract comply with the Statute of Frauds if it is applicable, which is the case here. *See* UCC § 2–201. Finally, it asserts that the January 25 and February 22 transactions were entirely separate and unrelated. Stinnes in response indicates that under § 2–209(4) an attempted modification may be viewed as a waiver of the no-oral-modification clause and the Statute of Frauds. Since under Stinnes's view of the facts there was an attempt to orally modify the January 25 contract, § 2–209(4) prevents Apex from raising the antimodification clause of the contract as a defense.

Whether the January 25 and February 22 transactions were separate and independent or related is a question of fact, open to proof at trial. Whether the alleged attempt at modification would be viewed as a waiver depends on the facts and circumstances, which also are to be adduced at trial.[7] *See, e.g., Federal Express, supra,* at 1302 (waiver inferred from conduct); *Dangerfield v. Markel,* 252 N.W.2d 184 (N.D.1977); *Linear Corp. v. Standard Hardware Co.,* 423 So.2d 966, 968 (Fla.App. 1983) ("evidence as to the parties' conduct supports finding ... a waiver"). Usage of trade, the parties' course of dealing and the course of performance under this contract are all relevant evidence on questions of contract interpretation. *See* §§ 1–205(3), 2–208(3). Accordingly, plaintiff can not be foreclosed by this motion from proceeding with this action.

■ 3. *Force majeure.* The January 25 contract provided that in the event a cause beyond a party's control prevents it from performing, its performance will be suspended without penalty for as long as the disability continues. Stinnes claims that this provision excused it from timely performance. Apex responds that the clause was not meant to apply to this situation.

Apex looks for support to § 2–615, which deals with excuse or suspense of performance for commercial impracticability. That section spells out the conditions under which a party's expected performance will be excused because of events beyond its control. Apex argues that the facts of this case do not fall within § 2–615's excusing provisions. This argument assumes, however, that § 2–615 is exclusive, and that the parties may not agree to provide for excusal or suspense of performance in circumstances where § 2–615 does not excuse or suspend performance. That is manifestly not the case. In the first place, § 1–102(3) permits parties to a contract to vary the Code's provisions by agreement. And in any event, it is clear from the case law that the parties were permitted to agree upon an excuse/suspense provision with terms broader than those of § 2–615, if that is what they chose to do. *Interpetrol Ber-*

---

7. Of course, it would be open to Apex to claim and prove retraction of any waiver Stinnes might establish. *See* UCC § 2–209(5).

*muda Ltd. v. Kaiser Aluminum Int'l Corp.,* 719 F.2d 992, 997–1000 (9th Cir. 1983). Whether the clause actually covers this type situation is a different question, one that should be answered by looking at the understanding of the parties in light of the circumstances at the time of contracting, taking account of "mercantile sense and reason." *See* UCC § 2–615 comment 8; *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.,* 532 F.2d 957, 990–92 (5th Cir.1976). Thus, what transpired here could legally have been covered by the force majeure clause of the contract. Whether it was in fact so covered, so that Stinnes would be released from timely delivery, presents yet another factual question which can not be decided on a motion to dismiss.

4. *Summary.* From the foregoing discussion it should be apparent that there are sets of facts which, if proved at trial, would support Stinnes's claim for relief. Accordingly, Apex's motion to dismiss the complaint must be denied.

## II. TRANSFER OF VENUE—28 U.S.C. § 1404(a).

Apex has requested that in the event I deny its Rule 12(b)(6) motion, I transfer this case to the District for the Eastern District of Missouri (E.D.Mo.) under 28 U.S.C. § 1404(a) (1982). Section 1404(a) permits a district court to transfer a case to another district court "[f]or the convenience of parties and witnesses, in the interest of justice...."

■ It is well-settled that on such a motion, the burden is on the movant "to establish that there should be a change of forum." *Factors Etc., Inc. v. Pro Arts, Inc.,* 579 F.2d 215, 218 (2d Cir.1978), *cert. denied,* 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979). To meet its burden, Apex has raised a number of proposed bases for transfer.

■ First, Apex contends that considerations of witnesses' convenience mandate transfer to E.D.Mo. Three of Apex's Missouri-based employees would need to be witnesses. Each is a key employee in Apex's trading operation, and the absence of each allegedly would severely disrupt Apex's operations. Stinnes, for its part, points to two non-party witnesses, former employees of Stinnes, who reside and work near New York.[8] One is self-employed and the other is vital to his employer. So it appears that on this point there is a mutual standoff; a transfer would merely switch the balance of inconveniences from one side to the other. The same can be said for the relative degrees of inconvenience to the parties. Although Stinnes is not now located in New York, it is not far from here, in suburban New Jersey. True, Apex is located within St. Louis, presumably nearer to E.D.Mo. than Stinnes is to this Court. But surely small differences in the distance of each party's commute to the courthouse are at best of minor significance.

Nor is access to documents and other proof a particularly persuasive factor in favor of transfer. Apex has not shown that its documents and other proof are particularly bulky or difficult to transport, or that it is somehow a greater imposition for Apex to bring its proof to New York than for Stinnes to bring its proof to St. Louis.

Nor is the fact that Missouri law controls this action relevant to this inquiry. This case is governed by the Uniform Commercial Code, which is the prevailing law in both New York and Missouri.[9]

Given the above facts, it does not appear that relative speed of the respective district courts in disposing of litigation is a weighty consideration. This is particularly so in a case as uncomplicated as this one seems.

---

**8.** Marcello lives in New Jersey and is employed in Connecticut. Bertolami resides and works in New Jersey.

**9.** I note that Missouri law in this area is not the least bit distinctive. In fact, my research has uncovered a marked paucity of Missouri cases in this area.

In sum, I do not see how transferring this case to E.D.Mo. would yield a substantial gain in overall convenience. Absent proof of such a gain, plaintiff's choice of forum should not be disturbed. A § 1404(a) motion should not be granted if all transfer would accomplish is to shift the inconveniences from one party to the other. *See Brierwood Shoe Corp. v. Sears, Roebuck & Co.*, 479 F.Supp. 563, 566 (S.D.N.Y. 1979). Since Apex has not met the heavy burden imposed on it, *see Factors Etc., supra,* its motion must be denied.

SO ORDERED.