**JASON'S FOODS, INC., an Illinois corporation, Plaintiff-Appellant,**

v.

**PETER ECKRICH & SONS, INC., a Delaware corporation, Defendant-Appellee.**

No. 84–2225.

United States Court of Appeals, Seventh Circuit.

Argued April 17, 1985.

Decided Oct. 2, 1985.

Norman Light, Norman Light, P.C., Chicago, Ill., for plaintiff-appellant.

Arnold D. Fielkow, Leahy & Eisenberg, Ltd., Chicago, Ill., for defendant-appellee.

Before POSNER and COFFEY, Circuit Judges, and DUMBAULD, Senior District Judge.*

POSNER, Circuit Judge.

The jurisdictional question that led us to order a limited remand in *Jason's Foods, Inc. v. Peter Eckrich & Sons, Inc.*, 768 F.2d 189 (7th Cir.1985), has been answered by the district judge: the defendant's principal place of business is Indiana, so there is diversity jurisdiction, and we can proceed to the merits of the appeal. Section 2–509(2) of the Uniform Commercial Code as adopted in Illinois (whose law, the parties agree, governs this diversity suit) provides that where "goods are held by a bailee to be delivered without being moved, the risk of loss passes to the buyer ... (b) on acknowledgment by the bailee of the buyer's right to possession of the goods." Ill. Rev.Stat. ch. 26, ¶ 2–509(2). We must decide whether acknowledgment to the *seller* complies with the statute. There are no reported cases on the question, either in Illinois or elsewhere. Three commentators have opined that acknowledgment must be to the buyer, but without discussion. See Nordstrom, Handbook of the Law of Sales 404–05 (1970); Howard, *Allocation of Risk of Loss Under the UCC: A Transactional Evaluation of Sections 2–509 and 2–510*, 15 UCC L.J. 334, 347 n. 42 (1983); Comment, *Risk of Loss Under Section 2509 of the California Uniform Commercial Code*, 20 UCLA L.Rev. 1352, 1358 n. 30 (1973). There is a hint of the same position, again without explanation, in Latty, *Sales and Title and the Proposed Code*, 16 Law & Contemp.Prob. 3, 14 (1951); Note, *Risk of Loss Under the Uniform Commercial Code*, 7 Ind.L.Rev. 711, 726 (1974), and Note, *Commercial Transactions: Risk of Loss: What Does the Code Mean by Bailee?*, 21 Okla.L.Rev. 310 (1968). The

* Hon. Edward Dumbauld of the Western District    of Pennsylvania, sitting by designation.

defendant submitted in the district court an affidavit from a professor of commercial law at Ohio State University (Professor Clovis), who also concluded, also without elaboration, that acknowledgment must be to the buyer. The plaintiff did not question the admissibility of expert testimony on a pure issue of domestic law—though well it might have. See, e.g., *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 510–11 (2d Cir.1977); *Loeb v. Hammond*, 407 F.2d 779, 781 (7th Cir.1969); *United States v. Zipkin*, 729 F.2d 384, 387 (6th Cir.1984). An alternative procedure would have been for the district judge to invite a disinterested expert on commercial law to submit a brief as *amicus curiae.* See Code of Judicial Conduct for United States Judges, Canon 3(A)(4) and commentary thereto.

On or about December 30, 1982, Jason's Foods contracted to sell 38,000 pounds of "St. Louis style" pork ribs to Peter Eckrich & Sons, delivery to be effected by a transfer of the ribs from Jason's' account in an independent warehouse to Eckrich's account in the same warehouse—which is to say, without the ribs actually being moved. In its confirmation of the deal, Jason's notified Eckrich that the transfer in storage would be made between January 10 and January 14. On January 13 Jason's phoned the warehouse and requested that the ribs be transferred to Eckrich's account. A clerk at the warehouse noted the transfer on its books immediately but did not mail a warehouse receipt until January 17 or January 18, and it was not till Eckrich received the receipt on January 24 that it knew the transfer had taken place. But on January 17 the ribs had been destroyed by a fire at the warehouse. Jason's sued Eckrich for the price. If the risk of loss passed on January 13 when the ribs were transferred to Eckrich's account, or at least before the fire, Jason's is entitled to recover the contract price; otherwise not. The district judge ruled that the risk of loss did not pass by then and therefore granted summary judgment for Eckrich.

Jason's argues that when the warehouse transferred the ribs to Eckrich's account, Jason's lost all rights over the ribs, and it should not bear the risk of loss of goods it did not own or have any right to control. Eckrich owned them and Eckrich's insurance covered any ribs that it owned; Jason's had no insurance and anyway, Jason's argues, it could not insure what it no longer owned. (The warehouse would be liable for the fire damage only if negligent. Cf. *Refrigeration Sales Co. v. Mitchell-Jackson, Inc.*, 770 F.2d 98 (7th Cir.1985).) Finally, Jason's points out that the draftsmen of the Uniform Commercial Code were careful and deliberate. Both subsections (a) and (c) of section 2–509(2)—the subsections that surround the "acknowledgment" provision at issue in this case—provide that the risk of loss passes to the buyer on or after "his receipt" of a document of title (negotiable in (a), nonnegotiable in (c)). If the draftsmen had meant that the acknowledgment of the buyer's right to possession of the goods—the acknowledgment that is subsection (b)'s substitute for a document of title—must be to the buyer, they would have said so.

Eckrich argues with great vigor that it cannot be made to bear the loss of goods that it does not know it owns. But that is not so *outré* a circumstance as it may sound. If you obtain property by inheritance, you are quite likely to own it before you know you own it. And Eckrich's position involves a comparable paradox: that Jason's continued to bear the risk of loss of goods that it knew it no longer owned. So the case cannot be decided by reference to what the parties knew or did not know; and neither can it be decided, despite Jason's' urgings, on the basis of which party could have insured against the loss. Both could have. Jason's had sufficient interest in the ribs until the risk of loss shifted to Eckrich to insure the ribs until then. You do not have to own goods to insure them; it is enough that you will suffer a loss if they are lost or damaged, *Hawkeye-Security Ins. Co. v. Reeg*, 128 Ill.App.3d 352, 83 Ill.Dec 683, 470 N.E.2d 1103 (1984); *Prince v. Royal Indemnity Co.*, 541 F.2d 646, 649 (7th Cir.1976), as of course Jason's would if the risk of loss

remained on it after it parted with title. See generally Stockton, *An Analysis of Insurable Interest Under Article Two of the Uniform Commercial Code*, 17 Vand. L.Rev. 815, 816–21 (1964). Section 2–509(2) separates title from risk of loss. Title to the ribs passed to Eckrich when the warehouse made the transfer on its books from Jason's' account to Eckrich's, but the risk of loss did not pass until the transfer was "acknowledged."

Thus, as is usually the case, insurability cannot be used to guide the assignment of liability. (The costs of insurance might sometimes be usable for this purpose, as we shall see, but not in this case.) Since whoever will be liable for the loss can insure against it, the court must determine who is liable before knowing who can insure, rather than vice versa. If acknowledgment to the seller is enough to place the risk of loss on the buyer, then Eckrich should have bought insurance against any losses that occurred afterward. If acknowledgment to the buyer is necessary (we need not decide whether acknowledgment to a third party may ever suffice), Jason's should have bought insurance against any losses occurring until then.

■ The suggestion that the acknowledgment contemplated by subsection (b) can be to the seller seems very strange. What purpose would it serve? When Jason's called up the warehouse and directed that the transfer be made, it did not add: and by the way, acknowledge to me when you make the transfer. Jason's assumed, correctly, that the transfer was being made forthwith; and in fact there is no suggestion that the warehouse clerk ever "acknowledged" the transfer to Jason's. If the draftsmen of subsection (b) had meant the risk of loss to pass when the transfer was made, one would think they would have said so, and not complicated life by requiring "acknowledgment."

■ A related section of the Uniform Commercial Code, section 2–503(4)(a), makes acknowledgment by the bailee (the warehouse here) a method of tendering goods that are sold without being physical-ly moved; but, like section 2–509(2)(b), it does not indicate to whom acknowledgment must be made. The official comments on this section, however, indicate that it was not intended to change the corresponding section of the Uniform Sales Act, section 43(3). See UCC comment 6 to § 2–503. And section 43(3) had expressly required acknowledgment to the buyer. See, e.g., *Peelle Co. v. Industrial Plant Corp.*, 120 N.J.L. 480, 200 A. 1007 (1938). Rules on tender have, it is true, a different function from rules on risk of loss; they determine at what point the seller has completed the performance of his side of the bargain. He may have completed performance, but if the goods are still in transit the risk of loss does not shift until the buyer receives them, if the seller is a merchant. See UCC § 2–509(3) and UCC comment 3 to section 2–509. In the case of warehouse transfers, however, the draftsmen apparently wanted risk of loss to conform to the rules for tender. For comment 4 to section 2–509 states that "where the agreement provides for delivery of the goods as between the buyer and seller without removal from the physical possession of a bailee, the provisions on manner of tender of delivery apply on the point of transfer of risk." And those provisions as we have said apparently require (in the case where no document of title passes) acknowledgment to the buyer. The acknowledgment need not, by the way, be in writing, so far as we are aware. Jason's could have instructed the warehouse to call Eckrich when the transfer was complete on the warehouse's books. See *Whately v. Tetrault*, 29 Mass.App.Dec. 112, 5 UCC Rep.Serv. (Callaghan) 838 (1964). That is why Jason's' case is not utterly demolished by the fact that the document of title—that is, the warehouse receipt—was not received by Eckrich till after the fire. Acknowledgment in a less formal manner is authorized; indeed, section 509(2)(b) would have no function if the only authorized form of acknowledgment were by document of title, whether negotiable or nonnegotiable.

The second sentence of comment 4 to section 509 is also suggestive: "Due delivery of a negotiable document of title covering the goods or acknowledgment by the bailee that he holds for the buyer completes the 'delivery' and passes the risk." The reference to a document of title is to subsections (a) and (c); and in both of those cases, of course, the tender involves notice to the buyer. It would be surprising if the alternative of acknowledgment did not.

All this may seem a rather dry textual analysis, remote from the purposes of the Uniform Commercial Code, so let us shift now to the plane of policy. The Code sought to create a set of standard contract terms that would reflect in the generality of cases the preferences of contracting parties at the time of contract. One such preference is for assignments of liability— or, what amounts to the same thing, assignments of the risk of loss—that create incentives to minimize the adverse consequences of untoward events such as (in this case) a warehouse fire. There are two ways of minimizing such consequences. One is to make them less painful by insuring against them. Insurance does not prevent a loss—it merely spreads it—but in doing so it reduces (for those who are risk averse) the disutility of the loss. So if one of the contracting parties can insure at lower cost than the other, this is an argument for placing the risk of loss on him, to give him an incentive to do so. But that as we have seen is not a factor in this case; either party could have insured (or have paid the warehouse to assume strict liability for loss or destruction of the goods, in which event the warehouse would have insured them), and so far as the record shows at equal cost.

The other method of minimizing the consequences of an unanticipated loss is through prevention of the loss. If one party is in a better position than the other to prevent it, this is a reason for placing the risk of loss on him, to give him an incentive to prevent it. It would be a reason for placing liability on a seller who still had possession of the goods, even though title had passed. But between the moment of transfer of title by Jason's and the moment of receipt of the warehouse receipt by Eckrich, neither party to the sale had effective control over the ribs. They were in a kind of limbo, until (to continue the Dantesque image) abruptly propelled into a hotter region. With Jason's having relinquished title and Eckrich not yet aware that it had acquired it, neither party had an effective power of control.

But this is not an argument for holding that the risk of loss shifted at the moment of transfer; it is just an argument for regarding the parties' positions as symmetrical from the standpoint of ability either to prevent or to shift losses. In such a case we have little to assist us besides the language of subsection (b) and its surrounding subsections and the UCC comments; but these materials do point pretty clearly to the conclusion that the risk of loss did not pass at the moment of transfer.

When did it pass? Does "acknowledgment" mean receipt, as in the surrounding subsections of 2–509(2), or mailing? Since the evidence was in conflict over whether the acknowledgment was mailed on January 17 (and at what hour), which was the day of the fire, or on January 18, this could be an important question—but in another case. Jason's waived it. The only theory it tendered to the district court, or briefed and argued in this court, was that the risk of loss passed either on January 13, when the transfer of title was made on the books of the warehouse, or at the latest on January 14, because Eckrich knew the ribs would be transferred at the warehouse sometime between January 10 and 14. We have discussed the immateriality of the passage of title on January 13; we add that the alternative argument, that Eckrich knew by January 14 that it owned the ribs, exaggerates what Eckrich knew. By the close of business on January 14 Eckrich had a well-founded expectation that the ribs had been transferred to its account; but considering the many slips that are possible between cup and lips, we do not think that this expectation should fix the point at which the risk shifts. If you were

told by an automobile dealer from whom you bought a car that the car would be delivered on January 14, you would not take out insurance effective that day, without waiting for the actual delivery.

Finally, Jason's' argument from trade custom or usage is unavailing. The method of transfer that the parties used was indeed customary but there was no custom or usage on when the risk of loss passed to the buyer.

AFFIRMED.