**WISCONSIN KNIFE WORKS,**
Plaintiff-Appellant,

v.

**NATIONAL METAL CRAFTERS,**
Defendant-Appellee.

No. 85–1801.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 10, 1985.

Decided Jan. 22, 1986.

Rehearing and Rehearing En Banc
Denied Feb. 19, 1986.

Robert J. Kay, Geisler & Kay, Madison, Wis., for plaintiff-appellant.

Barrett J. Corncille, Bell, Metzner & Gierhart, Madison, Wis., for defendant-appellee.

Before CUMMINGS, Chief Judge, and POSNER and EASTERBROOK, Circuit Judges.

**1282**

POSNER, Circuit Judge.

■ This is a diversity breach of contract case; and before getting to the merits we must decide, though neither party contests the point, whether the parties are indeed citizens of different states. The complaint alleges (and the answer admits) that the plaintiff, Wisconsin Knife Works, is a division of Black & Decker (U.S.), Inc., a corporation incorporated in Maryland and having its "principal offices other than in the State of Wisconsin," and that the defendant, National Metal Crafters, is a division of Keystone Consolidated Industries, Inc., which is incorporated in Delaware and has its principal place of business in Illinois. Although a division may, if state law permits, sue and be sued in its own name, see Fed.R.Civ.P. 17(b), the state of which it is a citizen for purposes of determining diversity is the state of which the corporation that owns the division is a citizen. The diversity statute deems a corporation a citizen of any state in which it is incorporated and also of the state in which it has its principal place of business. 28 U.S.C. § 1332(c). Hence the complaint adequately alleges that the defendant is a citizen of Delaware and Illinois. An allegation of citizenship proper in form and not contested establishes a party's citizenship for purposes of diversity jurisdiction, *Casio, Inc. v. S.M. & R. Co.*, 755 F.2d 528, 530 (7th Cir.1985), and the jurisdictional allegations were not contested here. So far so good. Regarding the plaintiff, however, also a division rather than a corporation, the complaint alleges that the corporation that owns it is a citizen of Maryland but fails to allege in what state it has its principal place of business. Assuming for the moment that "principal offices" is an inartful attempt to allege principal place of business, still all the complaint tells us is that Black & Decker is not a citizen of Wisconsin. That leaves open the possibility that it is a citizen of Illinois or Delaware, in which event the parties are not diverse and the suit must be dismissed.

■ The first thing a federal judge should do when a complaint is filed is check to see that federal jurisdiction is properly alleged. Because federal judges are not subject to direct check by any other branch of government—because the only restraint on our exercise of power is self-restraint—we must make every reasonable effort to confine ourselves to the exercise of those powers that the Constitution and Congress have given us. In this case, however, we are satisfied, despite the deficiency in the pleadings, that there is diversity of citizenship. The record shows and counsel confirmed at argument that Black & Decker's headquarters is in Maryland; and although the state in which a corporation has its headquarters is not always the state of the corporation's principal place of business (hence the complaint should not have used the term "principal offices"), usually it is. The test in this circuit for principal place of business is "nerve center," *In re Air Crash Disaster Near Chicago*, 644 F.2d 594, 620 (7th Cir.1981); *Celanese Corp. of America v. Vandalia Warehouse Corp.*, 424 F.2d 1176, 1178 (7th Cir.1970); and, to continue the neurological metaphor, we look for the corporation's brain, and ordinarily find it where the corporation has its headquarters. In the absence of any reason to think that Black & Decker's principal place of business might be in Illinois or Delaware, the two states of which the defendant is a citizen, the fact that its headquarters is in Maryland warrants an inference that the parties are of diverse citizenship. Compare *Casio, Inc. v. S.M. & R. Co., supra*, 755 F.2d at 529–30.

Some courts use a vaguer standard. They look not just to where the corporation has its headquarters but also to the distribution of the corporation's assets and employees. See 13B Wright, Miller & Cooper, Federal Practice and Procedure § 3625 (2d ed. 1984). We prefer the simpler test. Jurisdiction ought to be readily determinable. There are cases where a corporation's headquarters may be divided between states and cases where the nominal headquarters isn't really the directing intelligence of the corporation, and those cases could give trouble even under a simple

"nerve center" test, but we are satisfied that this is not such a case.

We come, then, to the merits of the appeal. Wisconsin Knife Works, having some unused manufacturing capacity, decided to try to manufacture spade bits for sale to its parent, Black & Decker, a large producer of tools, including drills. A spade bit is made out of a chunk of metal called a spade bit blank; and Wisconsin Knife Works had to find a source of supply for these blanks. National Metal Crafters was eager to be that source. After some negotiating, Wisconsin Knife Works sent National Metal Crafters a series of purchase orders on the back of each of which was printed, "Acceptance of this Order, either by acknowledgment or performance, constitutes an unqualified agreement to the following." A list of "Conditions of Purchase" follows, of which the first is, "No modification of this contract, shall be binding upon Buyer [Wisconsin Knife Works] unless made in writing and signed by Buyer's authorized representative. Buyer shall have the right to make changes in the Order by a notice, in writing, to Seller." There were six purchase orders in all, each with the identical conditions. National Metal Crafters acknowledged the first two orders (which had been placed on August 21, 1981) by letters that said, "Please accept this as our acknowledgment covering the above subject order," followed by a list of delivery dates. The purchase orders had left those dates blank. Wisconsin Knife Works filled them in, after receiving the acknowledgments, with the dates that National Metal Crafters had supplied in the acknowledgments. There were no written acknowledgments of the last four orders (placed several weeks later, on September 10, 1981). Wisconsin Knife Works wrote in the delivery dates that National Metal Crafters orally supplied after receiving purchase orders in which the space for the date of delivery had again been left blank.

Delivery was due in October and November 1981. National Metal Crafters missed the deadlines. But Wisconsin Knife Works did not immediately declare a breach, cancel the contract, or seek damages for late delivery. Indeed, on July 1, 1982, it issued a new batch of purchase orders (later rescinded). By December 1982 National Metal Crafters was producing spade bit blanks for Wisconsin Knife Works under the original set of purchase orders in adequate quantities, though this was more than a year after the delivery dates in the orders. But on January 13, 1983, Wisconsin Knife Works notified National Metal Crafters that the contract was terminated. By that date only 144,000 of the more than 281,000 spade bit blanks that Wisconsin Knife Works had ordered in the six purchase orders had been delivered.

Wisconsin Knife Works brought this breach of contract suit, charging that National Metal Crafters had violated the terms of delivery in the contract that was formed by the acceptance of the six purchase orders. National Metal Crafters replied that the delivery dates had not been intended as firm dates. It also counterclaimed for damages for (among other things) the breach of an alleged oral agreement by Wisconsin Knife Works to pay the expenses of maintaining machinery used by National Metal Crafters to fulfill the contract. The parties later stipulated that the amount of these damages was $30,000.

The judge ruled that there had been a contract but left to the jury to decide whether the contract had been modified and, if so, whether the modified contract had been broken. The jury found that the contract had been modified and not broken. Judgment was entered dismissing Wisconsin Knife Works' suit and awarding National Metal Crafters $30,000 on its counterclaim. Wisconsin Knife Works has appealed from the dismissal of its suit. The appeal papers do not discuss the counterclaim, and the effect on it of our remanding the case for further proceedings on Wisconsin Knife Works' claim will have to be resolved on remand.

The principal issue is the effect of the provision in the purchase orders that forbids the contract to be modified other than by a writing signed by an authorized repre-

sentative of the buyer. The theory on which the judge sent the issue of modification to the jury was that the contract could be modified orally or by conduct as well as by a signed writing. National Metal Crafters had presented evidence that Wisconsin Knife Works had accepted late delivery of the spade bit blanks and had cancelled the contract not because of the delays in delivery but because it could not produce spade bits at a price acceptable to Black & Decker.

■ Section 2–209(2) of the Uniform Commercial Code provides that "a signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded, but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party." (As several other subsections of section 2–209 are relevant to the appeal, we have printed the entire section as an Appendix to this opinion.) The meaning of this provision and its proviso is not crystalline and there is little pertinent case law. One might think that an agreement to exclude modification except by a signed writing must be signed in any event by the party against whom the requirement is sought to be enforced, that is, by National Metal Crafters, rather than by the party imposing the requirement. But if so the force of the proviso ("but except as between merchants ...") becomes unclear, for it contemplates that between merchants no separate signature by the party sought to be bound by the requirement is necessary. A possible reconciliation, though not one we need embrace in order to decide this case, is to read the statute to require a separate signing or initialing of the clause forbidding oral modifications, as well as of the contract in which the clause appears. There was no such signature here; but it doesn't matter; this was a contract "between merchants." Although in ordinary language a manufacturer is not a merchant, "between merchants" is a term of art in the Uniform Commercial Code. It means between commercially sophisticated parties (see UCC § 2–104(1); White & Sum-

mers, Handbook of the Law Under the Uniform Commercial Code 345 (2d ed. 1980)), which these were.

Of course there must still be a "signed agreement" containing the clause forbidding modification other than by a signed writing, but there was that (see definition of "agreement" and of "signed" in UCC §§ 1–201(3), (39)). National Metal Crafters' signed acknowledgments of the first two purchase orders signified its assent to the printed conditions and naturally and reasonably led Wisconsin Knife Works to believe that National Metal Crafters meant also to assent to the same conditions should they appear in any subsequent purchase orders that it accpeted. Those subsequent orders were accepted, forming new contracts on the same conditions as the old, by performance—that is, by National Metal Crafters' beginning the manufacture of the spade bit blanks called for by the orders. See UCC § 2–207(3). So there was an agreement, signed by National Metal Crafters, covering all the purchase orders. The fact that the delivery dates were not on the purchase orders when received by National Metal Crafters is nothing of which it may complain; it was given *carte blanche* to set those dates.

When National Metal Crafters had difficulty complying with the original specifications for the spade bit blanks, Wisconsin Knife Works modified them; and National Metal Crafters argues that the engineering drawings containing those modifications are the written modification that section 2–209(2), if applicable, calls for. In fact these particular modifications seem to fall within the clause of the contract that allows the buyer (Wisconsin Knife Works) to modify the specifications by notice. The context of this clause makes clear that such notice is not the written modification to which the previous sentence refers. But in any event there was no modification of the delivery dates. The "pert charts" which National Metal Crafters supplied Wisconsin Knife Works, and which showed new target dates for delivery, do not pur-

port to modify the contract and were not signed by Wisconsin Knife Works.

■ We conclude that the clause forbidding modifications other than in writing was valid and applicable and that the jury should not have been allowed to consider whether the contract had been modified in some other way. This may, however, have been a harmless error. Section 2–209(4) of the Uniform Commercial Code provides that an "attempt at modification" which does not satisfy a contractual requirement that modifications be in writing nevertheless "can operate as a waiver." Although in instructing the jury on modification the judge did not use the word "waiver," maybe he gave the substance of a waiver instruction and maybe therefore the jury found waiver but called it modification. Here is the relevant instruction:

> Did the parties modify the contract? The defendant bears the burden of proof on this one. You shall answer this question yes only if you are convinced to a reasonable certainty that the parties modified the contract.
>
> If you determine that the defendant had performed in a manner different from the strict obligations imposed on it by the contract, and the plaintiff by conduct or other means of expression induced a reasonable belief by the defendant that strict enforcement was not insisted upon, but that the modified performance was satisfactory and acceptable as equivalent, then you may conclude that the parties have assented to a modification of the original terms of the contract and that the parties have agreed that the different mode of performance will satisfy the obligations imposed on the parties by the contract.

To determine whether this was in substance an instruction on waiver we shall have to consider the background of section 2–209, the Code provision on modification and waiver.

Because the performance of the parties to a contract is typically not simultaneous, one party may find himself at the mercy of the other unless the law of contracts protects him. Indeed, the most important thing which that law does is to facilitate exchanges that are not simultaneous by preventing either party from taking advantage of the vulnerabilities to which sequential performance may give rise. If A contracts to build a highly idiosyncratic gazebo for B, payment due on completion, and when A completes the gazebo B refuses to pay, A may be in a bind—since the resale value of the gazebo may be much less than A's cost—except for his right to sue B for the price. Even then, a right to sue for breach of contract, being costly to enforce, is not a completely adequate remedy. B might therefore go to A and say, "If you don't reduce your price I'll refuse to pay and put you to the expense of suit"; and A might knuckle under. If such modifications are allowed, people in B's position will find it harder to make such contracts in the future, and everyone will be worse off.

The common law dealt with this problem by refusing to enforce modifications unsupported by fresh consideration. See, e.g., *Alaska Packers' Ass'n v. Domenico*, 117 Fed. 99 (9th Cir.1902), discussed in *Selmer Co. v. Blakeslee-Midwest Co.*, 704 F.2d 924, 927 (7th Cir.1983). Thus in the hypothetical case just put B could not have enforced A's promise to accept a lower price. But this solution is at once overinclusive and underinclusive—the former because most modifications are not coercive and should be enforceable whether or not there is fresh consideration, the latter because, since common law courts inquire only into the existence and not the adequacy of consideration, a requirement of fresh consideration has little bite. B might give A a peppercorn, a kitten, or a robe in exchange for A's agreeing to reduce the contract price, and then the modification would be enforceable and A could no longer sue for the original price. See White & Summers, *supra*, at 47; Farnsworth, Contracts 271–78 (1982).

The draftsmen of the Uniform Commercial Code took a fresh approach, by making modifications enforceable even if not supported by consideration (see section 2–

209(1)) and looking to the doctrines of duress and bad faith for the main protection against exploitive or opportunistic attempts at modification, as in our hypothetical case. See UCC § 2–209, official comment 2. But they did another thing as well. In section 2–209(2) they allowed the parties to exclude oral modifications. National Metal Crafters argues that two subsections later they took back this grant of power by allowing an unwritten modification to operate as a waiver.

The common law did not enforce agreements such as section 2–209(2) authorizes. The "reasoning" was that the parties were always free to agree orally to cancel their contract and the clause forbidding modifications not in writing would disappear with the rest of the contract when it was cancelled. "The most ironclad written contract can always be cut into by the acetylene torch of parol modification supported by adequate proof." *Wagner v. Graziano Construction Co.*, 390 Pa. 445, 448, 136 A.2d 82, 83–84 (1957). This is not reasoning; it is a conclusion disguised as a metaphor. It may have reflected a fear that such clauses, buried in the fine print of form contracts, were traps for the unwary; a sense that they were unnecessary because only modifications supported by consideration were enforceable; and a disinclination to allow parties in effect to extend the reach of the Statute of Frauds, which requires only some types of contract to be in writing. But the framers of the Uniform Commercial Code, as part and parcel of rejecting the requirement of consideration for modifications, must have rejected the traditional view; must have believed that the protection which the doctrines of duress and bad faith give against extortionate modifications might need reinforcement—if not from a requirement of consideration, which had proved ineffective, then from a grant of power to include a clause requiring modifications to be in writing and signed. An equally important point is that with consideration no longer required for modification, it was natural to give the parties some means of providing a substitute for the cautionary and evidentiary

function that the requirement of consideration provides; and the means chosen was to allow them to exclude oral modifications.

If section 2–209(4), which as we said provides that an attempted modification which does not comply with subsection (2) can nevertheless operate as a "waiver," is interpreted so broadly that *any* oral modification is effective as a waiver notwithstanding section 2–209(2), both provisions become superfluous and we are back in the common law—only with not even a requirement of consideration to reduce the likelihood of fabricated or unintended oral modifications. A conceivable but unsatisfactory way around this result is to distinguish between a modification that substitutes a new term for an old, and a waiver, which merely removes an old term. On this interpretation National Metal Crafters could not enforce an oral term of the allegedly modified contract but could be excused from one of the written terms. This would take care of a case such as *Alaska Packers,* where seamen attempted to enforce a contract modification that raised their wages, but would not take care of the functionally identical case where seamen sought to collect the agreed-on wages without doing the agreed-on work. Whether the party claiming modification is seeking to impose an onerous new term on the other party or to wriggle out of an onerous term that the original contract imposed on it is a distinction without a difference. We can see that in this case. National Metal Crafters, while claiming that Wisconsin Knife Works broke their contract as orally modified to extend the delivery date, is not seeking damages for that breach. But this is small comfort to Wisconsin Knife Works, which thought it had a binding contract with fixed delivery dates. Whether called modification or waiver, what National Metal Crafters is seeking to do is to nullify a key term other than by a signed writing. If it can get away with this merely by testimony about an oral modification, section 2–209(2) becomes very nearly a dead letter.

 The path of reconciliation with subsection (4) is found by attending to the

precise wording of (4). It does not say that an attempted modification "is" a waiver; it says that "it can operate as a waiver." It does not say in what circumstances it can operate as a waiver; but if an attempted modification is effective as a waiver only if there is reliance, then both sections 2–209(2) and 2–209(4) can be given effect. Reliance, if reasonably induced and reasonable in extent, is a common substitute for consideration in making a promise legally enforceable, in part because it adds something in the way of credibility to the mere say-so of one party. The main purpose of forbidding oral modifications is to prevent the promisor from fabricating a modification that will let him escape his obligations under the contract; and the danger of successful fabrication is less if the promisor has actually incurred a cost, has relied. There is of course a danger of bootstrapping—of incurring a cost in order to make the case for a modification. But it is a risky course and is therefore less likely to be attempted than merely testifying to a conversation; it makes one put one's money where one's mouth is.

We find support for our proposed reconciliation of subsections (2) and (4) in the secondary literature. See Eisler, *Oral Modification of Sales Contracts Under the Uniform Commercial Code: The Statute of Frauds Problem*, 58 Wash. U.L.Q. 277, 298–302 (1980); Farnsworth, *supra*, at 476–77; 6 Corbin on Contracts 211 (1962). It is true that 2 Anderson on the Uniform Commercial Code § 2–209:42 (3d ed. 1982), opines that reliance is not necessary for an attempted modification to operate as a waiver, but he does not explain his conclusion or provide any reason or authority to support it. This provision was quoted along with other material from Anderson in *Double-E Sportswear Corp. v. Girard Trust Bank*, 488 F.2d 292, 295 (3d Cir. 1973), but there was no issue of reliance in that case. 2 Hawkland, Uniform Commercial Code Series § 2–209:05, at p. 138 (1985), remarks, "if clear factual evidence other than mere parol points to that conclusion [that an oral agreement was made altering a term of the contract], a waiver

may be found. In the normal case, however, courts should be careful not to allow the protective features of sections 2–209(2) and (3) to be nullified by contested parol evidence." (Footnote omitted.) The instruction given by the judge in this case did not comply with this test, but in any event we think a requirement of reliance is clearer than a requirement of "clear factual evidence other than mere parol."

Our approach is not inconsistent with section 2–209(5), which allows a waiver to be withdrawn while the contract is executory, provided there is no "material change of position in reliance on the waiver." Granted, in (5) there can be no tincture of reliance; the whole point of the section is that a waiver may be withdrawn unless there is reliance. But the section has a different domain from section 2–209(4). It is not limited to attempted modifications invalid under subsections (2) or (3); it applies, for example, to an express written and signed waiver, provided only that the contract is still executory. Suppose that while the contract is still executory the buyer writes the seller a signed letter waiving some term in the contract and then, the next day, before the seller has relied, retracts it in writing; we have no reason to think that such a retraction would not satisfy section 2–209(5), though this is not an issue we need definitively resolve today. In any event we are not suggesting that "waiver" means different things in (4) and (5); it means the same thing; but the *effect* of an attempted modification as a waiver under (4) depends in part on (2), which (4) (but not 5)) qualifies. Waiver and estoppel (which requires reliance to be effective) are frequently bracketed. See, e.g., *Chemetron Corp. v. McLouth Steel Corp.*, 522 F.2d 469, 472–73 (7th Cir.1975); *Hirsch Rolling Mill Co. v. Milwaukee & Fox River Valley Ry.*, 165 Wis. 220, 161 N.W. 741 (1917).

The statute could be clearer; but the draftsmen were making a big break with the common law in subsections (1) and (2), and naturally failed to foresee all the ramifications of the break. The innovations

made in Article 9 of the UCC were so novel that the article had to be comprehensively revised only ten years after its promulgation. See Appendix II to the 1978 Official Text of the Uniform Commercial Code. Article 2 was less innovative, but of course its draftsmanship was not flawless—what human product is? Just a few months ago we wrestled with the mysterious and apparently inadvertent omission of key words in the middle subsection of another section of Article 2. See *Jason's Foods, Inc. v. Peter Eckrich & Sons, Inc.*, 774 F.2d 214 (7th Cir.1985) (section 2–509(2)). Another case of gap-filling in Article 2 is discussed in White & Summers, *supra*, at 450 (section 2–316(3)(a)). But as a matter of fact we need go no further than section 2–209(5) to illustrate the need for filling gaps in Article 2. In holding that that section allows the retraction of a waiver of the Statute of Frauds, the Third Circuit said in *Double-E Sportswear Corp. v. Girard Trust Bank, supra*, 488 F.2d at 297 n. 7, "We have found it necessary to fill the interstices of the code," because of "a drafting oversight."

We know that the draftmen of section 2–209 wanted to make it possible for parties to exclude oral modifications. They did not just want to give "modification" another name—"waiver." Our interpretation gives effect to this purpose. It is also consistent with though not compelled by the case law. There are no Wisconsin cases on point. Cases from other jurisdictions are diverse in outlook. Some take a very hard line against allowing an oral waiver to undo a clause forbidding oral modification. See, e.g., *South Hampton Co. v. Stinnes Corp.*, 733 F.2d 1108, 1117–18 (5th Cir.1984) (Texas law); *U.S. Fibres, Inc. v. Proctor & Schwartz, Inc.*, 358 F.Supp. 449, 460 (E.D.Mich.1972), aff'd, 509 F.2d 1043 (6th Cir.1975) (Pennsylvania law). Others allow oral waivers to override such clauses, but in most of these cases it is clear that the party claiming waiver had relied to his detriment. See, e.g., *Gold Kist, Inc. v. Pillow*, 582 S.W.2d 77, 79–80 (Tenn.App.1979) (where this feature of the case is emphasized); *Linear Corp. v. Stan-*

*dard Hardware Co.*, 423 So.2d 966 (Fla. App.1982); cf. *Rose v. Spa Realty Associates*, 42 N.Y.2d 338, 343–44, 397 N.Y.S.2d 922, 925–26, 366 N.E.2d 1279, 1282–83 (1977). In cases not governed by the Uniform Commercial Code, Wisconsin follows the common law rule that allows a contract to be waived orally (unless within the Statute of Frauds) even though the contract provides that it can be modified only in writing. See, e.g., *S & M Rotogravure Service, Inc. v. Baer*, 77 Wis.2d 454, 468–69, 252 N.W.2d 913, 920 (1977). But of course the Code, which is in force in Wisconsin as in every other state (with the partial exception of Louisiana), was intended to change this rule for contracts subject to it.

■ Missing from the jury instruction on "modification" in this case is any reference to reliance, that is, to the incurring of costs by National Metal Crafters in reasonable reliance on assurances by Wisconsin Knife Works that late delivery would be acceptable. And although there is evidence of such reliance, it naturally was not a focus of the case, since the issue was cast as one of completed (not attempted) modification, which does not require reliance to be enforceable. National Metal Crafters must have incurred expenses in producing spade bit blanks after the original delivery dates, but whether these were *reliance* expenses is a separate question. Maybe National Metal Crafters would have continued to manufacture spade bit blanks anyway, in the hope of selling them to someone else. It may be significant that the stipulated counterclaim damages seem limited to the damages from the breach of a separate oral agreement regarding the maintenance of equipment used by National Metal Crafters in fulfilling the contract. The question of reliance cannot be considered so open and shut as to justify our concluding that the judge would have had to direct a verdict for National Metal Crafters, the party with the burden of proof on the issue. Nor, indeed, does National Metal Crafters argue that reliance was shown as a matter of law.

There is no need to discuss most of the other alleged errors in the conduct of the trial; they are unlikely to recur in a new trial. We do however point out that Wisconsin Knife Works' objections to the introduction of parol evidence have no merit once the issue is recast as one of waiver. The purpose of the parol evidence rule is to defeat efforts to vary by oral evidence the terms of a written instrument that the parties intended to be the fully integrated expression of their contract; it has no application when the issue is whether one of the parties later waived strict compliance with those terms.

■■■ The only other issue that merits discussion is Wisconsin Knife Works' contention that the judge should not have let in evidence about its high costs of manufacturing spade bits, which it says is irrelevant to whether National Metal Crafters broke the contract. But it is relevant, though to a different issue. National Metal Crafters argues that it did Wisconsin Knife Works a favor by its slow delivery of the spade bit blanks because Wisconsin Knife Works was unable to manufacture spade bits at anywhere near the cost at which Black & Decker could buy them from its existing supplier. If the argument is correct, it shows either that Wisconsin Knife Works sustained no damage from the alleged breach of contract, or, what amounts to the same thing, that the alleged breach was not causally related to that damage. As in tort law, so in contract law, causation is an essential element of liability. See, e.g., *Lincoln Nat'l Life Ins. Co. v. NCR Corp.*, 772 F.2d 315, 320 (7th Cir. 1985); *S.J. Groves & Sons Co. v. Warner Co.*, 576 F.2d 524, 527 (3d Cir.1978). If the damage of which the promisee complains would not have been avoided by the promisor's not breaking his promise, the breach cannot give rise to damages. If Wisconsin Knife Works couldn't have made any money from manufacturing spade bits no matter how promptly National Metal Crafters delivered the blanks for them, the failure to make prompt delivery caused no legal injury and cannot provide the foundation for a successful damage suit even if the late delivery was a breach of the contract.

■■■ When a jury instruction is erroneous there must be a new trial unless the error is harmless. On the basis of the record before us we cannot say that the error in allowing the jury to find that the contract had been modified was harmless; but we do not want to exclude the possibility that it might be found to be so, on motion for summary judgment or otherwise, without the need for a new trial. Obviously National Metal Crafters has a strong case both that it relied on the waiver of the delivery deadlines and that there was no causal relationship between its late deliveries and the cancellation of the contract. We just are not prepared to say on the record before us that it is such a strong case as not to require submission to a jury.

Circuit Rule 18 shall not apply on remand.

REVERSED AND REMANDED.

### APPENDIX

### UCC § 2–209

(1) An agreement modifying a contract within this Article needs no consideration to be binding.

(2) A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded, but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party.

(3) The requirements of the statute of frauds section of this Article (Section 2–201) must be satisfied if the contract as modified is within its provisions.

(4) Although an attempt at modification or rescission does not satisfy the requirements of subsection (2) or (3) it can operate as a waiver.

(5) A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that

strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver.

EASTERBROOK, Circuit Judge, dissenting.

The majority demonstrates that the clause of the contract requiring all modifications to be in writing is enforceable against National Metal Crafters. There was no modification by a "signed writing." Yet § 2–209(4) of the Uniform Commercial Code, which Wisconsin has adopted, provides that "an attempt at modification" that is ineffective because of a modification-only-in-writing clause "can operate as a waiver." The majority holds that no "attempt at modification" may be a "waiver" within the meaning of § 2–209(4) unless the party seeking to enforce the waiver has relied to its detriment. I do not think that detrimental reliance is an essential element of waiver under § 2–209(4).

"Waiver" is not a term the UCC defines. At common law "waiver" means an intentional relinquishment of a known right. A person may relinquish a right by engaging in conduct inconsistent with the right or by a verbal or written declaration. I do not know of any branch of the law—common, statutory, or constitutional—in which a renunciation of a legal entitlement is effective only if the other party relies to his detriment. True, the law of "consideration" imposed something like a reliance rule; payment of a pine nut (the peppercorn of nouvelle cuisine) is a tiny bit of detriment, and often the law of consideration is expressed in terms of detriment. But § 2–209(1) of the UCC provides that consideration is unnecessary to make a modification effective. The introduction of a reliance requirement into a body of law from which the doctrine of consideration has been excised is novel.

Neither party suggested that reliance is essential to waiver. The parties did not even mention the question in their briefs, which concentrated on the meaning of "signed agreement." So far as I can tell, no court has held that reliance is an essential element of waiver under § 2–209(4). One has intimated that reliance is not essential. *Double-E Sportswear Corp. v. Girard Trust Bank,* 488 F.2d 292, 295–296 (3d Cir.1973), citing 1 Anderson, *Uniform Commercial Code* § 2–209:8 (2d ed.). The third edition of Anderson, like the second, states that reliance is unnecessary. *Id.* at § 2–209:42 (3d ed. 1982). See also Hawkland, *Uniform Commercial Code Series* § 2–209:05 (suggesting that reliance on a waiver by course of performance is unnecessary).[*]

Not all novel things are wrong, although legal novelties, like biological mutations, usually die out quickly. This novelty encounters an obstacle within § 2–209. Section 2–209(5) states that a person who "has made a waiver affecting an executory portion of the contract may retract the waiver" on reasonable notice "unless the retraction would be unjust in view of a material change of position in reliance on the waiver." Section 2–209 therefore treats "waiv-

---

[*] The sources the majority cites for the contrary position do not offer much support. Corbin's treatise on contracts views § 2–209(2) as a regrettable inroad on the flexible construction of contracts. 6 Corbin, *Contracts* § 1295 at 211–12 (1962). The word "reliance" does appear in Corbin's discussion, but I read it as a reference to § 2–209(5). Corbin's position is that § 2–209(4) and (5) should prevent § 2–209(2) from doing "serious damage;" the majority inserts a reliance requirement in § 2–209(4) to prevent what it sees as potentially serious damage *to* § 2–209(2). Farnsworth, like Corbin, is hostile to § 2–209(2). He opines: "It would be possible to give an expansive meaning to the term *waiver* in these provisions and thereby reach results similar to those reached in cases decided under the common law rule. The clause, then, would be effective only if there had been no reliance." *Contracts* 476–77 (1982) (emphasis in original). This does not look like a proposal to make waiver depend on reliance; it is a proposal to make "the clause"—the modification-only-in-writing clause—effective only if there has been reliance. Eisler would like to use reliance as part of a waiver because she wants to *change* § 2–209. She thinks that oral modifications of *any* contract should require consideration, despite § 2–209(1), and a reliance rule is a step in that direction. 58 Wash.U.L.Q. at 280–81, 300–01.

er" and "reliance" as different. Under § 2–209(4) a waiver may be effective; under § 2–209(5) a waiver may be effective *prospectively* only if there was also detrimental reliance.

The majority tries to reconcile the two subsections by stating that they have different domains. Section 2–209(4) deals with oral waivers, while § 2–209(5) "is not limited to attempted modifications invalid under subsections (2) or (3); it applies, for example, to express written waivers, provided only that the contract is executory." This distinction implies that subsection (4) applies to a subset of the subjects of subsection (5). Things are the other way around. Subsection (4) says that an attempt at modification may be a "waiver," and subsection (5) qualifies the effectiveness of "waivers" in the absence of reliance. See comment 4 to § 2–209. The two have the same domain—all attempts at modification, be they oral, written, or implied from conduct, that do not satisfy the Statute of Frauds, § 2–209(3), or a "signed writing" requirement of a clause permitted under § 2–209(2). The majority suggests that § 2–209(5) also applies to signed waivers, but this gets things backward. A "signed writing" is binding as a modification under § 2–209(2) without the need for "waiver." Section 2–209(1) lifts the requirement of consideration, so a signed pledge not to enforce a term of a contract may not be revoked under § 2–209(5) unless the pledge reserves the power of revocation. Because "waiver" is some subset of failed efforts to modify, it cannot be right to treat a successful effort to modify (a signed writing) as a "waiver" governed by subsection (5).

"Waiver" therefore ought to mean the same in subsections (4) and (5). Unsuccessful attempts at modification may be waivers under § 2–209(4). Then § 2–209(5) deals with a subset of these "waivers," the subset that affects the executory portion of the contract. Waivers affecting executory provisions are enforceable or not depending on reliance. We know from the language and structure of § 2–209 that there is a difference between waivers that affect the executory portions of contracts and waivers that do not. Under the majority's reading, however, there is no difference. No waiver is effective without detrimental reliance. It is as if the majority has eliminated § 2–209(4) from the UCC and rewritten § 2–209(5) to begin: "A party who has made [an ineffectual attempt at modification] affecting [any] portion of the contract may retract...."

Repair work of this kind sometimes is necessary. A legislature has many minds, and as years pass these different people may use the same word in different ways; so, too, the shifting coalitions that create a complex statute may contribute to it multiple meanings of a single word, the more so because amendments may be added to a statute after other portions have been bargained out. Section 2–209 of the UCC is not a slapdash production or the work of competing committees unaware of each other's words, however. The UCC is one of the most carefully assembled statutes in American history. It was written under the guidance of a few people, all careful drafters, debated for a decade by the American Law Institute and committees of commercial practitioners, and adopted en bloc by the states. Vague and uncertain in places the Code is; no one could see all of the problems that would come within its terms, and in some cases foreseen problems were finessed rather than solved. But "waiver" did not call for finesses, and § 2–209 was drafted and discussed as a single unit. "Waiver" in § 2–209(4) and "waiver" in § 2–209(5) are six words apart, which is not so great a gap that the mind loses track of meaning.

The subsections read well together if waiver means "intentional relinquishment of a known right" in both. Section 2–209(4) says that a failed attempt at modification may be a waiver and so relinquish a legal entitlement (such as the entitlement to timely delivery); § 2–209(5) adds that a waiver cannot affect the executory portion of the contract (the time of future deliveries, for example) if the waiving party retracts, unless there is also detrimental re-

liance. But for § 2.209(2) the oral waiver could affect the executory portion of the contract even without reliance. It is not necessary to vary the meaning of the word to make sense of each portion of the statute.

The majority makes reliance an ingredient of waiver not because the structure of the UCC demands this reading, but because it believes that otherwise the UCC would not deal adequately with the threat of opportunistic conduct. The drafters of the UCC chose to deal with opportunism not through a strict reading of waiver, however, but through a statutory requirement of commercial good faith. See § 2–103 and comment 2 to § 2–209. The modification-only-in-writing clause has nothing to do with opportunism. A person who has his contracting partner over a barrel, and therefore is able to obtain a concession, can get the concession in writing. The writing will be the least of his worries. In almost all of the famous cases of modification the parties reduced the new agreement to writing.

A modification-only-in writing clause may permit the parties to strengthen the requirement of commercial good faith against the careless opportunist, but its principal function is to make it easier for business to protect their agreement against casual subsequent remarks and manufactured assertions of alteration. It strengthens the Statute of Frauds. Even so, the Code does not allow the clause to be airtight. Comment 4 to § 2–209 states: "Subsection (4) is intended, despite the provisions of subsections (2) and (3), to prevent contractual provisions excluding modification except by a signed writing from limiting in other respects the legal effect of the parties' actual later conduct. The effect of such conduct as a waiver is further regulated in subsection (5)." In other words, the UCC made modification-only-in-writing clauses effective for the first time, but the drafters meant to leave loopholes. The majority's observation that waiver under § 2–209(4) could nullify some benefits of clauses permitted under § 2–209(2) is true, but it is not a reason for adding novel

elements to "waiver." It might be sensible to treat claims of oral waiver with suspicion and insist on waiver by course of performance—for example, accepting belated deliveries without protest, or issuing new orders (or changing the specifications of old orders) while existing ones are in default. Waiver implied from performance is less prone to manipulation. This method of protecting modification-only-in-writing clauses gives waiver the same meaning throughout the statute, but it does not help Wisconsin Knife, for the claim of waiver here is largely based on the course of performance.

The reading I give to waiver also affords substantial effect to modification-only-in-writing clauses. To see this, consider three characterizations of the dealings between Wisconsin Knife Works and National Metal Crafters. The first, which Wisconsin Knife Works presses on us, is that there was no modification and no "attempt at modification" within the meaning of § 2–209(4). National Metal Crafters promised to deliver the blanks in the fall of 1981. When it fell behind, Wisconsin Knife Works had to decide whether to give up on National Metal Crafters (and collect any damages to which it may have been entitled) or ask National Metal Crafters to keep trying. National Metal Crafters may have been slow, but it had a head start on anyone else Wisconsin Knife Works might have asked to make the blanks. Wisconsin Knife Works wanted both to preserve its rights and to minimize its damages, and it did not surrender its legal remedies by trying to mitigate. It was entitled to throw up its hands in January 1983 and collect damages from National Metal Crafters for nonperformance.

The second characterization is that when National Metal Crafters ran into trouble producing on schedule, National Metal Crafters and Wisconsin Knife Works discussed the problem and agreed that National Metal Crafters could have more time in order to get the job done right. On this story, Wisconsin Knife Works valued a high quality product and a successful busi-

ness relation more than it valued its legal right to prompt performance. Perhaps Wisconsin Knife Works did not even want performance so soon, for it was not ready to turn the blanks into spade bits and did not want blanks piling up in warehouses. So Wisconsin Knife Works told National Metal Crafters to take the time to do it right. On my view this would be a waiver under § 2–209(4). When National Metal Crafters took more time than Wisconsin Knife Works could stomach, Wisconsin Knife Works announced that too much is enough, and it retracted the waiver. Section 2–209(5) allowed it to do just this unless National Metal Crafters had relied to its detriment on Wisconsin Knife Works's words and conduct. Having retracted the waiver, Wisconsin Knife Works could declare National Metal Crafters in breach—but because the waiver excused National Metal Crafters's performance until January 1983, Wisconsin Knife Works could not collect damages for delay. The parties would simply walk away from the contract. See *Dangerfield v. Markel*, 252 N.W.2d 184, 191–93 (N.D.1977).

The third characterization is the one National Metal Crafters presses here. National Metal Crafters tells us that the purchase orders never were the "real" contract. Instead Wisconsin Knife Works and National Metal Crafters embarked on joint operations to find a new way to make spade bits. The purchase orders were parts of a larger joint venture, which did not have formal terms. As the parties went along they modified their understandings and accommodated each other's needs. The latest modification occurred when National Metal Crafters gave Wisconsin Knife Works a "pert chart" indicating realistic dates for quantity shipments, and people at Wisconsin Knife Works said that these dates and quantities were acceptable. The dates ran into April 1983. This implies that when Wisconsin Knife Works declared the relationship at an end in January 1983, it breached the contract (as modified), and National Metal Crafters is entitled to damages—at a minimum profits lost on blanks scheduled for delivery

through April 1983, perhaps even profits National Metal Crafters anticipated through continuation of this relationship for a longer run.

Section 2–209(2) puts this third position out of court. The third story would be a thoroughgoing reshaping of the obligations, which could not occur unless reflected in a "signed writing." The "pert chart" is not such a writing because Wisconsin Knife Works, the party sought to be bound, did not sign it. The discussions could be at most "an attempt at modification" under § 2–209(4), and therefore could be a waiver. Under § 2–209(5) Wisconsin Knife Works could rescind its waiver prospectively unless that "would be unjust in view of a material change of position in reliance on the waiver"—here, for example, proof that National Metal Crafters had already manufactured the blanks scheduled for delivery in April 1983, or had bought equipment with no alternative use. National Metal Crafters has not argued that it had the sort of reliance that would enable it to enforce the executory portion of any modification, and therefore Wisconsin Knife Works was entitled to cancel the contract and walk away in January 1983 free from liability save for goods furnished or expenses incurred in reliance before January 1983. This treatment of § 2–209(5) solves, for the most part, the problem of fabricated claims of modification. "Attempts at modification" generally are not enforceable prospectively—and if there is commercial bad faith (that is, opportunistic conduct), they are not enforceable at all. There is no serious remaining problem to which a reliance element in the definition of waiver is a solution.

Because § 2–209(2) and (5) eliminate National Metal Crafters's principal position, we are left with the first two—either Wisconsin Knife Works stood on its entitlement to timely delivery but stuck with National Metal Crafters to mitigate damages, or Wisconsin Knife Works waived the requirement of timely delivery but in January 1983 rescinded the waiver. The jury's finding that Wisconsin Knife Works and Na-

tional Metal Crafters "modified" their contract, though an answer to a legally erroneous question, resolves this dispute. Wisconsin Knife Works vigorously argued at trial that at all times it stood on its rights but went along with delayed delivery as a second-best solution. The jury's finding that Wisconsin Knife Works and National Metal Crafters modified their contract—in the words of the instruction, that Wisconsin Knife Works "by conduct or other means of expression induced a reasonable belief by [National Metal Crafters] that strict enforcement was not insisted upon, but that the modified performance was satisfactory and acceptable as equivalent"— necessarily rejects Wisconsin Knife Works's version of events. The evidence was sufficient to permit the jury to reject this version. We are left with "an attempt at modification" that may operate as a waiver, which Wisconsin Knife Works may and did revoke. See also *Chemetron Corp. v. McLouth Steel Corp.*, 522 F.2d 469, 472 (7th Cir.1975), which defines the elements of waiver much as the district court's instruction defined modification.

If National Metal Crafters were claiming damages for lost profits, it would be necessary to determine whether National Metal Crafters detrimentally relied on Wisconsin Knife Works's waiver. But National Metal Crafters does not want damages for work to be performed after January 1983. It simply wants to defeat Wisconsin Knife Works's claim for damages for belated delivery. (It also sought and received $30,-000 for reliance expenditures before January 1983, which is not problematic under my construction of § 2–209.) The jury, although improperly instructed, has found enough to support a judgment discharging National Metal Crafters from liability to Wisconsin Knife Works. This requires us to affirm the judgment.

A requirement of reliance will not make a difference very often—certainly not in this case. Any waiver that is more than a condonation of an existing default will induce some reliance. The buyer who asks a seller of fungible goods to defer delivery induces reliance even though the waiver of timely delivery will not affect the production of the goods. When the goods have a custom design, as the spade bit blanks do, some reliance is close to a certainty. I doubt that National Metal Crafters would have produced the same goods in the same quantity but for a belief that Wisconsin Knife Works wanted to have them. A change of position in reliance on the frequent discussions is all the majority requires. Summary judgment cannot be far away. Still, it is better not to ask unnecessary questions even when the questions have ready answers.